IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

EARL RINGO, et al.,           )
                              )
       Petitioners,           )
                              )
          vs.                 )   Case No. 09-04095-NKL
                              )
GEORGE A. LOMBARDI, et        )
al.,                          )
                              )   August 23, 2010
       Respondents.           )   Jefferson City, Missouri

DEPOSITION OF GEORGE A. LOMBARDI,

a Respondent, produced, sworn and examined on August 23,
2010, between the hours of 8:00 a.m. and 6:00 p.m. of that
day, at the offices of the Missouri Attorney General,
Broadway State Office Building, 221 West High Street, 6th
Floor, in the City of Jefferson, County of Cole, State of
Missouri, before

SHELLY L. STEWART, CCR (No. 619)
CAPITAL CITY COURT REPORTING
Jefferson City ** The Lake ** Columbia
573-761-4350 * 573-365-5226 * 573-445-4142

within and for the State of Missouri, in the above-entitled
cause, on the part of Petitioners Ringo, Middleton, Bucklew
and Smulls, taken pursuant to notice.

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

```
 1                 A P P E A R A N C E S

 2

 3   FOR PETITIONERS RINGO, MIDDLETON, BUCKLEW & SMULLS:

 4

 5           CHERYL A. PILATE
 6               Attorney at Law
 7               MORGAN PILATE
 8               142 North Cherry Street
 9               Olathe, Kansas  66061
10               Telephone:  913-829-6336
11               Facsimile:  913-829-6446
                 E-mail:  cpilate@morganpilate.com
12
13                       &
14
                 JOSEPH W. LUBY
15               Attorney at Law
                 PUBLIC INTEREST LITIGATION CLINIC
16               6155 Oak Street
                 Suite C
17               Kansas City, Missouri  64113
                 Telephone:  816-363-2795
18               Facsimile:  816-363-2799
                 E-mail:  jluby@plic.net
19
     FOR THE DEFENDANTS:
20
                 SUSAN D. BORESI
21               Assistant Attorney General
                 815 Olive Street
22               Suite 200
                 St. Louis, Missouri  63101
23               Telephone:  314-340-7881
                 Facsimile:  314-340-7891
24               E-mail:  susan.boresi@ago.mo.gov

25                       &
```

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

```
 1              MICHAEL J. SPILLANE

 2                  Assistant Attorney General

 3                  Broadway State Office Building

 4                  7th Floor

 5                  221 West High Street

 6                  Jefferson City, Missouri  65101

 7                  Telephone:  573-751-3321

 8                  Facsimile:  573-751-0774

 9                  E-mail:  michael.spillane@ago.mo.gov

10

11    SIGNATURE INSTRUCTIONS:

12

13    Signature Requested; Presentment Waived.

14

15    EXHIBIT INSTRUCTIONS:

16    Petitioners' Deposition Exhibit Nos. 1 through 6,

      inclusive, are attached to the original transcript.

17

18                     I N D E X

19

20    Direct Examination by Ms. Pilate              5

21

22

23

24

25
```

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1                    E X H I B I T S

2

3      Petitioners' Deposition Exhibit No. 1

4      Protocol for Preparation and

5      Injection of Chemicals                          33

6

7      Petitioners' Deposition Exhibit No. 2

8      Interrogatories                                 72


9
       Petitioners' Deposition Exhibit No. 3

10     Memorandum and Sequence of Chemicals

       and Chemical Log form from Mr. Clements to

11     Mr. Larkins, dated June 2, 2009                 95


12     Petitioners' Deposition Exhibit No. 4

       Department of Corrections Forms:

13     Sequence of Chemicals, Pre-Execution

       Summary of Medical History, and

14     Medical & Nonmedical Personnel Checklist        95

15

16     Petitioners' Deposition Exhibit No. 5

17     DEA Controlled Substance

18     Registration Certificate                        101

19

20     Petitioners' Deposition Exhibit No. 6

21     Department of Corrections

22     Training Academy Lesson Plan                    102

23

24

25

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    GEORGE A. LOMBARDI, having first been duly sworn, testified

2    as follows:

3    DIRECT EXAMINATION BY MS. PILATE:

4        Q.  Good morning, Mr. Lombardi.

5        **A.  Good morning.**

6        Q.  How are you?

7        **A.  Okay.**

8        Q.  Could you please state what you do for a living?

9        **A.  I'm the director of the Missouri Department of**

10    **Corrections.**

11        Q.  And how long have you been with the Department of

12    Corrections?

13        **A.  This go-around since February -- January of '09.**

14        Q.  Okay.  When you say this go-around, what do you

15    mean?

16        **A.  I retired in 2005 after 33 years in the**

17    **Department of Corrections.**

18        Q.  And someone persuaded you to return?

19        **A.  Yes.**

20        Q.  How did that come about?

21        **A.  I actually was recruited by the governor to come**

22    **be director.**

23        Q.  Uh-huh.  So you were 33 years with the DOC and

24    retired in '05?

25        **A.  Uh-huh.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1       Q.   And then when you were enjoying your retirement

2   years and presumably playing with grandchildren or

3   something like that enjoyable, someone recruited -- the

4   governor recruited you and asked you to come back?

5       **A.   Yeah.  I applied for the job and -- under the**

6   **understanding that he was interested in hiring me.**

7       Q.   Okay.  What year did you start with the

8   Department of Corrections and then we'll work through your

9   various positions?

10      **A.   I actually started as an intern working on my**

11  **master's degree in psychology from Central Missouri State**

12  **at the time in 1972.**

13          **In 1973 after that six-month internship, I was**

14  **hired on on a federal grant as program director of a**

15  **prerelease program.  And that was at Renz Correctional**

16  **Center, which no longer exists.**

17      Q.   That was a women's facility, correct?

18      **A.   No.  It was a male facility back then.**

19      Q.   Back then?

20      **A.   Yeah.**

21      Q.   Okay.

22      **A.   And in September of 1976, I became warden of the**

23  **State Correctional Prerelease Center in Tipton, Missouri.**

24  **And that was after the realignment of the women and the men**

25  **between Tipton and Renz.  I took the men up to Tipton and**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    the women came from Tipton to Renz.

2         Q.   Okay.

3         A.   In 1979, I became warden of the Algoa

4    Correctional Center out here east of town here in Jefferson

5    City.

6              In 1983, I became assistant director of the

7    Division of Adult Institutions and was responsible for half

8    the prisons in terms of supervision.

9         Q.   Uh-huh.

10        A.   And then in 1986, I became director of the

11   Division of Adult Institutions and retired in that capacity

12   in February of 2005.

13        Q.   And who was director when you retired?

14        A.   Gary Kempker.

15        Q.   Who was the director of -- oh, of the Department

16   of Corrections?

17        A.   Uh-huh.

18        Q.   Okay.  Gary Kempker?

19        A.   Well, actually -- no, Larry Crawford had already

20   come in.

21        Q.   Okay.

22        A.   I'm sorry.  Larry Crawford had come in as

23   director.

24        Q.   Okay.  In your capacity as director of Adult

25   Institutions, did you have any involvement with executions?

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    A.    I did.

2    Q.    And what was your involvement?

3    A.    As director of the institutions, I was present at

4    all the executions, except for the ones that I wasn't,

5    which either I was out of state or something, but for the

6    vast majority I was.

7          And in that capacity I was responsible for

8    overseeing all the operations in terms of the security of

9    the operation, make sure everything was in place.

10         And I also was present during the executions.

11   Q.    During each execution?

12   A.    Pardon me?

13   Q.    During each execution?

14   A.    Yes.

15   Q.    How many executions were you present for?

16   A.    Probably 60.

17   Q.    Did you play any active role in them?

18   A.    Pardon me?

19   Q.    Did you play any active role in them?

20   A.    What do you mean by that?

21   Q.    Did you physically do anything?

22   A.    No.

23   Q.    And was your role pretty much a supervisory one?

24   A.    Yes.

25   Q.    Were you the person who was in contact with the

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1   governor and the courts during the process or was that

2   somebody else?

3       **A.   No.   That would be the director.**

4       Q.   Okay.  And what did you do?  You said you secured

5   security, what do you mean by that?

6       **A.   I meant that I made sure that there was -- the**

7   **external security personnel were adequate, the internal**

8   **security personnel were adequate, that the entrance and**

9   **egress of the victim's witnesses, inmate witnesses and**

10  **state witnesses were appropriate.  I did all that through**

11  **supervising the warden and my associates.**

12      Q.   Okay.  You said you supervised the warden, what

13  does that mean?  Did you supervise him in his tasks in

14  aiding in the execution?

15      **A.   What do you mean by aiding in the -- you mean the**

16  **actual execution itself?**

17      Q.   Uh-huh.

18      **A.   No, just in his role of the warden of that prison**

19  **and, you know, assigning people to the different security**

20  **posts, ensuring that that egress of people was appropriate,**

21  **so that would be part of my responsibility.**

22      Q.   Okay.  Where were you during the executions?

23      **A.   I was in the area between the state's witnesses**

24  **and the victim's witnesses.**

25      Q.   Who was the person who was in charge with the

Electronically signed by Shelly Stewart (401-194-331-8303)   bed293be-8fc7-431e-b284-5910c8d127cd

1    governor's office and the courts?

2         A.    **You mean who was the contact?**

3         Q.    The liaison.

4         A.    **Okay.  The contact with the governor's office**

5    **would be the director and the contact with the courts was**

6    **the chief counsel.**

7         Q.    How many individuals were actively physically

8    involved in the execution process during those years?

9         A.    **I don't remember the exact number.  I don't**

10   **recall that.**

11        Q.    Could you give me an approximation?  Was there

12   less than --

13        A.    **I would be guessing.  I don't remember.**

14        Q.    Well, what I mean is dealing with the person

15   being executed, was it fewer than ten, more than ten?

16        A.    **Probably fewer than ten.**

17        Q.    Okay.  And that group included department

18   employees; is that right?

19        A.    **Yes.**

20        Q.    And then outside contractors with medical

21   backgrounds?

22        A.    **Correct.**

23        Q.    Was there always a doctor present during the

24   execution?

25        A.    **I believe that is the case.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.

2      **A.   I believe that is the case.**

3      Q.   Do you recall any execution where the doctor was

4   not present?

5      **A.   I don't.**

6      Q.   Okay.  Were there other medical professionals

7   there with the doctor?

8      **A.   Yes.**

9      Q.   Okay.  And who were they, by description?

10     **A.   There was a nurse present.**

11     Q.   Was there a doctor and a nurse at every

12  execution?

13     **A.   I can't tell you that.  I don't recall that.**

14     Q.   Was there always a second medical person there

15  with the doctor?

16     **A.   Don't recall that.**

17     Q.   Was there ever any other kind of medical

18  professional there besides a doctor and a nurse?

19     **A.   Not to my knowledge.**

20     Q.   Has there ever a pharmacist there?

21     **A.   Not to my knowledge.**

22     Q.   Has there ever been an EMT?

23     **A.   I don't recall that.**

24     Q.   To prepare for today's deposition, did you do

25  anything?

Electronically signed by Shelly Stewart (401-194-331-8303)   bed293be-8fc7-431e-b284-5910c8d127cd

1    **A.   Did I do anything?**

2    Q.   To review, yeah.  Did you review anything to

3  prepare for today's deposition?

4    **A.   I reviewed my interrogatory answers.**

5    Q.   Did you review anything else?

6    **A.   No.**

7    Q.   Have you given a deposition before?

8    **A.   I have.**

9    Q.   How many times have you been deposed?

10   **A.   I don't recall.  Probably more than 20.**

11   Q.   Have you ever been deposed in connection with

12 lethal injection?

13   **A.   Not per se.  I have been deposed on the death**

14 **penalty issue before.**

15   Q.   Okay.

16   **A.   I don't recall that it had anything to do**

17 **specifically with lethal injection.**

18   Q.   What did it have to do with?

19   **A.   I can't recall what the issue was.  It's been a**

20 **number of years ago.**

21   Q.   Now, during those years when you were director of

22 Adult Institutions, was there a written execution protocol?

23   **A.   There was.**

24   Q.   And what did that say?

25   **A.   What did it say?**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Uh-huh.

2           MS. BORESI:  I'm going to object to the question

3    as overly broad.

4    BY MS. PILATE:

5      Q.   What did -- could you describe the protocol?

6    What did it cover, what subjects?  Did it say who needed to

7    be there?  Did it say what they did?  Did it say what

8    chemical or drugs were to be used?  What did it say?

9      **A.   All of those things that you just said.**

10     Q.   Okay.  Can you tell me what you remember about

11   the protocol?

12     **A.   Very little.  It's been too many years.**

13     Q.   Well, tell me anything you remember.

14     **A.   I know that there was information about what**

15   **everybody was supposed to do.  There was information about**

16   **the drugs.  There was information -- but the specifics, you**

17   **know, are -- elude me.**

18     Q.   Did you ever review it?

19     **A.   Yes.**

20     Q.   Did you have any role in drafting it?

21     **A.   No.**

22     Q.   And what was your purpose in reviewing it?  Did

23   you have a reviewing responsibility or --

24     **A.   Well, I know I probably had input, especially**

25   **into the security aspects of it.  I reviewed that to make**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    sure that there was adequate personnel available,

2    especially in the security piece of it.  I did ensure that

3    there were -- you know, the issue I talked about before

4    about the entrance and egress, to make sure that the

5    witnesses did not, in fact, have contact with one another.

6            The other thing I remember is to ensure that the

7    staff of the prison did not have contact with protesters.

8    That was the county's responsibility.  Those are the kind

9    of things I remember having input into.

10       Q.   Who drafted the protocol?

11       A.   Back then?

12       Q.   Uh-huh.

13       A.   I'm sure counsel had a lot to do with it, but,

14   you know, I'm not going to be very specific and remember

15   exactly how that happened.

16       Q.   Was there one unified protocol or were there

17   separate directions for different groups of people like

18   security people, medical people, other people?

19       A.   Well, there were post orders for a variety of

20   different people.

21       Q.   Okay.  What do you mean post orders?

22       A.   I mean, what they were supposed to do.

23       Q.   Uh-huh.

24       A.   So you had an external security officer and what

25   their job was, as an example.  So there were a number of

Electronically signed by Shelly Stewart (401-194-331-8303)                              bed293be-8fc7-431e-b284-5910c8d127cd

1    those.

2         Q.    Uh-huh.  Was there a protocol for the

3    administration of the lethal injection drugs?

4         **A.    To the best of my recollection.**

5         Q.    Well, did you ever see it?

6         **A.    I probably did.**

7         Q.    Do you have a specific recollection?

8         **A.    No.**

9         Q.    So you know nothing about that?

10        **A.    I don't have a recollection about it.  I don't**

11   **remember if I -- I certainly didn't -- that's all I have to**

12   **say.  I don't remember it.**

13        Q.    Okay.  You don't remember it one way or the

14   other?

15        **A.    Right.**

16             MS. BORESI:  Well, I'm going to object.  I think

17   that mischaracterizes his testimony.  He said he doesn't

18   remember specifics.

19             THE WITNESS:  Right.

20   BY MS. PILATE:

21        Q.    Well, we'll clarify here.  Do you remember that

22   such a document existed?

23        **A.    To the best of my recollection, yes, there was a**

24   **document involving the administration of the drugs.**

25        Q.    Who wrote that?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1     A.   I don't recall that.

2     Q.   What did it say?

3     A.   I don't recall.

4     Q.   Was it ever reviewed by anyone?

5     A.   I don't recall who, if anyone, did review that.

6     Q.   Who relied on that document?

7     A.   Who relied on the document?

8     Q.   Yeah.  Who was it supposed to provide guidance

9  to?

10     A.   Those that were involved in the execution process

11  itself.

12     Q.   Do you know if the doctor, who was with the

13  execution team at that time, had a role in writing that

14  protocol?

15     A.   I don't recall.

16     Q.   Was anyone responsible, other than the doctor,

17  for reviewing or revising that protocol?

18     A.   No, I don't recall specifically.

19     Q.   Did anyone ever watch the doctor as he prepared

20  the drugs for execution?

21     A.   Well, everybody that was in the execution process

22  area would have been there at the time, so . . .

23     Q.   Did anyone with medical knowledge ever watch the

24  doctor as he prepared the drugs?

25          MS. BORESI:  I'm going to object.  I don't know

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1  that it's been established that this witness has personal

2  knowledge as to what was done in the execution room unless

3  he was there himself.

4  MS. PILATE:  Okay.  Let me say, he can answer

5  that.  If you don't know something, I would prefer -- let

6  me make it clear now.  If he doesn't know something or it's

7  not within his personal knowledge, he can say that.  I can

8  then ask him did anyone ever tell you about that, because

9  that's also discoverable, but an objection like that tends

10  to coach the witness.

11  BY MS. PILATE:

12  Q.  So I'll just say right now, for the record, so

13  that you understand, if there is something you don't know,

14  just say I don't know.  That's fine with me.  I'm not going

15  to try to get you to reconstruct memories you don't have.

16  So if you don't know something, say you don't

17  know.  If you don't remember, you say you don't remember.

18  If you didn't see something, you can say I never saw that,

19  but then I might ask you, did anyone ever tell you about

20  that?  So all of those things are proper during the

21  deposition, okay?

22  **A.    Uh-huh.**

23  Q.  Okay.  Now, with regard to the prior protocol --

24  MS. PILATE:  Could you please read back what my

25  question was before the objection?

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1          THE COURT REPORTER:  "Question:  Did anyone with

2   medical knowledge ever watch the doctor as he prepared the

3   drugs?"

4          THE WITNESS:  I don't know.

5   BY MS. PILATE:

6       Q.   Did anyone ever tell you whether or not anyone

7   with medical knowledge watched the --

8       **A.   Not that I recall.**

9       Q.   Now, are you aware that a new protocol was issued

10  in July of 2006 relating to the administration of lethal

11  injection?

12      **A.   I am.**

13      Q.   Do you know to what degree the present protocol

14  is similar to the protocol that was used before 2006?

15      **A.   No.**

16      Q.   Do you know who wrote the protocol that is being

17  used now?

18      **A.   No.  I was not present for that.**

19      Q.   Okay.  What is your present involvement with

20  executions?

21      **A.   As director I am, as I said before, the director**

22  **of Corrections is the liaison with the governor's office**

23  **during that process.**

24      Q.   Are you, according to your procedures, supposed

25  to be present for every execution as director of the

Electronically signed by Shelly Stewart (401-194-331-8303)                                          bed293be-8fc7-431e-b284-5910c8d127cd

1    Department of Corrections?

2         A.    **I'm to be present on-site, yes.**

3         Q.    Are you aware if there were any problems noted

4    with the prior protocol?

5         A.    **No.**

6         Q.    Did anyone ever tell you about any problems

7    involved with the doctor who was present at the executions

8    during the time that you were director of Adult

9    Institutions?

10         A.    **Yes, I'm aware of the issues with the doctor.**

11         Q.    Okay.  What did you learn about that?

12         A.    **What I knew about that issue frankly was in the**

13    **newspaper, about his comments.**

14         Q.    Okay.  Did anyone ever tell you in your capacity

15    as an official within the Department of Corrections that

16    there had been problems?

17         A.    **No, not that I recall.**

18         Q.    Did you ever have a conversation with anyone at

19    the Department of Corrections about problems with the

20    doctor?

21         A.    **No, I did not.**

22         Q.    Did anyone within the Department ever make you

23    aware of any problems with the mixing of the lethal

24    injection drugs by the doctor who was involved in the

25    executions up through 2005?

Electronically signed by Shelly Stewart (401-194-331-8303)    bed293be-8fc7-431e-b284-5910c8d127cd

1    **A.   No.**

2    Q.   So that conversation -- no such conversation ever

3 occurred with you?

4    **A.   That's how I recall.  I do not recall any such**

5 **conversation.**

6    Q.   Did anyone ever send to you a memorandum or any

7 kind of written communication on that topic?

8    **A.   Not that I recall.**

9    Q.   Are you saying that the only knowledge that you

10 ever obtained of any problems with that doctor's method in

11 mixing drugs came from press coverage?

12    **A.   That's how I recall it at this point.**

13    Q.   Were you still with the Department when that

14 press coverage occurred?

15    **A.   Yes.**

16    Q.   What did you do in response to seeing the press

17 coverage?

18    **A.   I don't recall that I did anything in particular.**

19    Q.   Did you ever make inquiry with anyone about what

20 was going on or who was supervising the doctor?

21    **A.   No.**

22    Q.   And why was that?

23    **A.   That issue, to the best of my knowledge, was the**

24 **director's issue.  All that came out through the director**

25 **of Corrections at the time.**

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   So that was not your responsibility?

2     **A.   No.**

3     Q.   Do you know how the particular drugs that have

4  been used in lethal injection in Missouri have been

5  selected?

6     **A.   Not specifically.  I don't recall that.  I know**

7  **that when we started the process, that that set of drugs**

8  **had already been used in other jurisdictions, and to the**

9  **best of my recollection, that was why they were selected.**

10    Q.   Has -- do you know if at any point there has ever

11  been a change in the particular drugs that have been used?

12    **A.   No, not to my knowledge.**

13    Q.   Do you know if the doctor who was present and

14  involved with the executions up through '05 ever wrote any

15  prescriptions for any of the drugs used in executions?

16    **A.   No, I'm not aware of that.**

17    Q.   You're not aware one way or the other, you just

18  don't know?

19    **A.   I'm not aware, no.**

20    Q.   What about at present, do you know if anyone

21  writes any prescriptions for any of the drugs used in

22  lethal injection?

23    **A.   I don't believe that that occurs.**

24    Q.   What is the basis of your belief?

25    **A.   The issue is, as I understand it, that once the**

Electronically signed by Shelly Stewart (401-194-331-8303)
bed293be-8fc7-431e-b284-5910c8d127cd

1    **DEA and the Missouri Health Department has approved that**

2    **drug -- those drugs, that there's no necessity to do a**

3    **prescription for them.**

4        Q.   And how did you come to that conclusion?

5        **A.   I can't recall how we got that information, but**

6    **that's my understanding.**

7        Q.   Now, do you know if the FDA has ever approved the

8    drugs used in lethal injection for the purpose of

9    execution, either individually or in combination?

10       **A.   No, I don't believe that that has occurred.**

11       Q.   Okay.  So to your knowledge, the FDA has not

12   approved sodium thiopental for use in executions?

13       **A.   That's true.**

14       Q.   Okay.  And to your knowledge, the FDA has not

15   approved pancuronium bromide for use in executions?

16       **A.   True.**

17       Q.   And to your knowledge, the FDA has not approved

18   the use of potassium chloride for executions?

19       **A.   True.**

20       Q.   Can you tell me what your basis is for believing

21   that these drugs can be used either individually or in

22   combination in an execution?

23       **A.   As I understand it, that -- because the**

24   **institution itself has a certification from DEA and from**

25   **the Missouri Department of Health to utilize the drugs,**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    that that is not necessary or required.

2        Q.   Okay.   What type of certification are you talking

3    about?

4        **A.   There's a certification to utilize the drugs from**

5    **DEA and from the Missouri Department of Health as I**

6    **understand it.**

7        Q.   Is it to use the drugs for these purposes?

8        **A.   It's to -- just to have the drugs and use them as**

9    **they see fit.**

10       Q.   Do you know if it's been disclosed to the DEA and

11   the Missouri Health Department that the drugs were being

12   used for the purpose of lethal injection?

13       **A.   I have no specific knowledge of that.**

14       Q.   Now, what does the DEA have to do with the drugs

15   that are used in lethal injection?

16       **A.   They have to approve the possession of the drugs**

17   **by our agency, as I understand it.**

18       Q.   Is that for all drugs or one or --

19       **A.   For scheduled -- for narcotic drugs to the best**

20   **of my recollection, best of my knowledge.**

21       Q.   Okay.   And your institutions might possess

22   narcotic drugs for other substance -- for other reasons

23   other than execution, right?

24       **A.   True.**

25       Q.   So you would agree that -- for instance, an

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1   institution might need to have a DEA license to possess

2   tranquilizers or benzodiazepine that might be given to an

3   inmate for a number of reasons?

4       **A.   I don't have specific knowledge about that, but**

5   **I -- that's all I know.**

6       Q.   Do you know which of the lethal injection drugs

7   is what you call a narcotic?

8       **A.   No.**

9       Q.   Do you believe all of them are narcotics?

10      **A.   I don't have enough knowledge to say one way or**

11  **the other.**

12      Q.   Who makes a decision as to whether or not a

13  prescription is written?

14      **A.   My understanding is that there is not a necessity**

15  **to have a prescription written once we have the DEA**

16  **certification and the Department of Health certification.**

17  **But those decisions were made during the -- apparently**

18  **during the time the protocol was written in my absence.**

19      Q.   Okay.  Now, would you agree that most hospitals

20  probably dispense narcotics?

21      **A.   True.**

22      Q.   Okay.  And so you would assume that they would

23  have some certification or approval or document of some

24  kind from the DEA saying that they are approved for

25  possession of narcotics?

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1      **A.   I have no knowledge about what hospitals do in**
2   **that relationship.**
3      Q.   Okay.  Well, is it your understanding a hospital
4   would generally have to have a prescription in order to
5   dispense a drug for a specific purpose?
6           MS. BORESI:  I'm going to object to the question.
7   The witness said he doesn't have knowledge and it's also
8   asking him to form a legal opinion.
9           MS. PILATE:  I'm just asking him based on his
10  knowledge as a -- as a person.
11          THE WITNESS:  I have no idea.
12  BY MS. PILATE:
13     Q.   A human being living in this world?
14     **A.   I'm living in this world, but I have no knowledge**
15  **about what hospitals do in terms of their drugs.**
16     Q.   Okay.  Do you know if the prison health services,
17  when they are dispensing narcotics, do so with a
18  prescription or written order from the doctor?
19     **A.   I have to assume that they do, but I don't have**
20  **specific knowledge of that.**
21     Q.   Okay.  Why do they use prescriptions?
22     **A.   Why do they use prescriptions?**
23     Q.   Yeah.  You said -- or, you know, assuming they
24  use prescriptions, which you assume they do, why would the
25  prison health services use prescriptions if the facility

Electronically signed by Shelly Stewart (401-194-331-8303)                          bed293be-8fc7-431e-b284-5910c8d127cd

1    has a DEA certification of some kind?

2         **A.   I think that's what their requirement is as a**

3    **medical entity, but I don't know enough about this to make**

4    **a judgment about that.**

5         Q.   Okay.  Whose requirement is as a medical entity?

6         **A.   The medical entity I'm referring to is the people**

7    **that provide medical care for the inmates.  In this case**

8    **Correctional Medical Services.**

9         Q.   Okay.  Do you know if they rely on their own

10   certification or the facility's certification?

11        **A.   I have no idea what the answer to that question**

12   **is.  I just don't know.**

13        Q.   And in your experience as a person, do doctors

14   write prescriptions for narcotics?

15        MS. BORESI:  Object on grounds of relevance.

16   BY MS. PILATE:

17        Q.   You can answer.

18        **A.   Yes, I'm sure they do.**

19        Q.   Okay.  And presumably some of those prescriptions

20   would be written for individuals in facilities such as

21   nursing homes, hospitals and the like, would they not?

22        **A.   I suppose.**

23        Q.   Okay.  And what I'm trying to figure out is why a

24   prescription would not be written for an inmate receiving a

25   narcotic?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1          A.    I don't know enough about that.

2          Q.    Whose responsibility is it to have the knowledge

3     in that area so that they could answer a question about

4     that?

5          A.    Knowledge of what, about what?

6          Q.    Prescriptions.

7          A.    I'm sorry?

8          Q.    What I just asked you about.  I just asked you

9     about prescriptions for inmates receiving drugs in a lethal

10    injection.  And you said, I don't know enough about that.

11    So I'm asking you who would have the knowledge about that

12    topic?

13         A.    Are you asking me -- I'm confused, because you

14    started asking me about any prescriptions for narcotic

15    drugs.  And are you asking me now about the lethal

16    injection drugs?

17              MS. PILATE:  Could you please go back and read

18    the question that preceded Mr. Lombardi's answer, I don't

19    know enough about that.

20              THE COURT REPORTER:  "Question:  And what I'm

21    trying to figure out is why a prescription would not be

22    written for an inmate receiving a narcotic?"

23              MS. PILATE:  I don't think that's -- is that the

24    one that says --

25              THE COURT REPORTER:  And then after that he said:

Electronically signed by Shelly Stewart (401-194-331-8303)                                                                    bed293be-8fc7-431e-b284-5910c8d127cd

1          "Answer:  I don't know enough about that."

2          MS. PILATE:  Okay.  What's the next question?

3          THE COURT REPORTER:  "Question:  Whose

4   responsibility is it to have the knowledge in that area so

5   that they could answer a question about that?"

6   BY MS. PILATE:

7      Q.   Okay.  Let me reframe that.  Can you tell me why

8   there are no prescriptions written for inmates receiving

9   drugs in lethal injection?

10     **A.   Because, as I understand it, and I think I've**

11  **answered it before, that there is a certification from DEA**

12  **and from the Missouri Health Department to allow us to**

13  **possess those drugs and use them accordingly.**

14     Q.   Can they be used by anybody in the facility?

15     **A.   Not to my knowledge.**

16     Q.   Who has to use them?

17     **A.   The medical team that applies them.**

18     Q.   Can those drugs be generally used in your

19  facility without any prescription?

20     **A.   The lethal injection drugs?**

21     Q.   Yeah, for any purpose.

22     **A.   The lethal injection drugs?**

23     Q.   Well, they are drugs that have a variety of

24  medical purposes, right?

25     **A.   True.**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   And are you saying they can be used in your

2  facility for any particular purpose with no prescription?

3    **A.   I don't know that they are used that way.**

4    Q.   But I'm asking you could they be?

5    **A.   I have no idea.**

6    Q.   Who has knowledge of this area?

7    **A.   What area?**

8    Q.   Prescriptions and lethal injection drugs?

9    **A.   The use of prescriptions for lethal injection**

10   **drugs, I'm telling you all I know and beyond that I don't**

11   **know.**

12   Q.   Who would have any further knowledge than you?

13   **A.   I have no idea who that would be.**

14   Q.   Is there a person who would have any more

15  knowledge than you?

16   **A.   I don't know.**

17   Q.   Okay.  Have you ever -- have you ever heard of

18  something called an off-label use of a drug?

19   **A.   No.**

20   Q.   Okay.  Are you aware that the FDA approves

21  certain drugs for certain purposes?

22   **A.   I don't know.**

23   Q.   Or approves drugs for certain purposes, I should

24  say?

25   **A.   I mean, I have no knowledge what exactly the FDA**

Electronically signed by Shelly Stewart (401-194-331-8303)                                bed293be-8fc7-431e-b284-5910c8d127cd

1    **does, except that the little area that I just explained**

2    **which is the FDA has certified for us to have possession of**

3    **those drugs.**

4         Q.   The FDA or DEA?

5         **A.   The DEA rather, not the FDA.**

6         Q.   Okay.  But I think you said you don't know

7    whether the FDA has approved any of these drugs for the

8    purpose of lethal injection?

9         **A.   Yes, that's correct.**

10        Q.   Now, when a drug is not approved for a particular

11   purpose, are you aware of whether that drug can be used for

12   a non-approved purpose, legally used for a non-approved

13   purpose?

14        **A.   I have no idea.**

15             MS. BORESI:  I'm going to also object that it

16   calls for his legal knowledge or legal opinion.

17             MS. PILATE:  I'll just state for the record, I'm

18   not asking for legal knowledge, for medical knowledge.

19   BY MS. PILATE:

20        Q.   I'm asking you as director of the Department of

21   Corrections that presides over executions, I'm asking you

22   that question:  Are you aware if drugs can be used for

23   purposes that they have not been approved for?

24        **A.   I have no idea.**

25        Q.   Okay.  If they are used for such purposes, do you

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    know if that violates law?

2         A.    I have no idea.

3         Q.    Have you ever heard of something called an

4    off-label use?

5         A.    I do not know that.

6         Q.    Okay.  Do you know if an off-label use requires a

7    prescription?

8         A.    I do not know what an off-label use is.

9         Q.    Who guides you in making determinations about

10   whether the lethal injection protocol complies with law?

11        A.    Counsel.

12        Q.    When was the last time the lethal injection

13   protocol was reviewed?

14        A.    I don't know.  That was prior to my becoming

15   director.

16        Q.    Have you conducted any review of the lethal

17   injection protocol?

18        A.    No.

19        Q.    If the Court in this case were to issue a ruling

20   pertaining to the application of federal law in stating

21   that any portion of the protocol or procedure used in

22   lethal injection violated federal law, what would you do?

23        A.    Well, you're talking about a hypothetical

24   situation.  I believe that we do comply with the federal

25   law.  And having said that, if there was some adverse

Electronically signed by Shelly Stewart (401-194-331-8303)          bed293be-8fc7-431e-b284-5910c8d127cd

1    **decision, then I would take that under counsel's advice as**

2    **to what would happen next.**

3         Q.   Okay.  If an order was issued stating that the

4    failure to have prescriptions violated federal law, would

5    you take some step to bring about the writing of

6    prescriptions for these drugs?

7         A.   **I think I have the same answer to that question**

8    **as I had to the previous, which is that it's a hypothetical**

9    **situation.  We believe we're in concert with federal law**

10   **and if there was that kind of a decision, we would take it**

11   **under advice of counsel.**

12        Q.   Is there any reason prescriptions couldn't be

13   written?

14        A.   **The information I have is it's not necessary to**

15   **write prescriptions.**

16        Q.   But what I'm asking you is, is there any reason

17   they couldn't be written?

18        A.   **I have no idea.**

19        Q.   Is there any impediment to the writing of

20   prescriptions?

21        A.   **It's not necessary based on the information I**

22   **have.**

23        Q.   I'm not asking if it's necessary.  This is:  Can

24   you do it?  It may not, in your mind, be necessary, but

25   what I'm asking you is, is there any barrier or obstacle

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1   that you know of to the writing of prescriptions?

2       **A.   I have no idea.  I just don't know.**

3           MS. PILATE:  Okay.  Let me make this the first

4   exhibit.

5           (PETITIONERS' DEPOSITION EXHIBIT NO. 1 WAS MARKED

6   FOR IDENTIFICATION BY THE COURT REPORTER.)

7   BY MS. PILATE:

8       Q.   Mr. Lombardi, I'm going to hand you Deposition

9   Exhibit 1.  And it is a document that I think has probably

10  been produced in connection with a number of litigations.

11  We received it in the context of discovery in this case, so

12  you see at the bottom it's says Ringo 1234.  That is an

13  indication that it was produced in Ringo vs. Lombardi.

14      **A.   Okay.**

15      Q.   Now, turning to the fourth page, do you see a

16  date of July 14, 2006?

17      **A.   I do.**

18      Q.   Okay.  Is this document entitled Preparation and

19  Injection of Chemicals, is this still the document that

20  governs how executions are carried out in the Department?

21      **A.   To the best of my knowledge, that's true.**

22      Q.   Okay.  And to your knowledge, this document has

23  not been revised in any way?

24      **A.   No.**

25      Q.   Have you ever reviewed it with the idea that

Electronically signed by Shelly Stewart (401-194-331-8303)           bed293be-8fc7-431e-b284-5910c8d127cd

1     someone should see if it needs to be revised in any way?

2          A.   I have not.

3          Q.   At present how many members are there of the

4     execution team?

5          A.   Let's see, I believe there are four members.

6          Q.   And who are they?

7          A.   They are medical personnel and Department

8     personnel.

9          Q.   Okay.  What kind of medical personnel?

10         A.   There may be a physician, potentially a nurse and

11    then staff.

12         Q.   What do you mean potentially a nurse?

13         A.   Well, I mean, to the best of my knowledge, there

14    have been always two people present and that has been their

15    titles.

16         Q.   So there's a doctor and there's a nurse?

17         A.   That's as I understand it.

18         Q.   Okay.  And presently is there a doctor with the

19    execution team?

20         A.   There is.

21         Q.   Okay.  Is the doctor a he or a she?

22              MR. SPILLANE:  I'm going to object to that as

23    going within the protective order as to identifications.

24              Subject to that --

25              Well, Sue, do you want to say anything?

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1          MS. BORESI:  Subject to that, you can answer.

2          But we're not going to provide any identifying

3     information with regard to any members of the execution

4     team.

5          MS. PILATE:  I'm not asking for their Social

6     Security number.  I'm not going to go any further than I

7     did with the nurse, and I'll call him -- what is he, M3, is

8     that how you refer to him?

9          MS. BORESI:  I think that is his designation.

10    BY MS. PILATE:

11         Q.   I just want a designation here and under the

12    protective order you can provide us that much.

13              There is a doctor assigned to the team, right?

14         **A.   Yes.**

15         Q.   Does this person go by the designation of M3?

16         **A.   I don't recall what that designation is**

17    **specifically.**

18         Q.   Okay.  Have you ever reviewed a form signed by an

19    M2 or an M3?

20         **A.   I may have.  I'm not specific about it.  I don't**

21    **remember.**

22         Q.   Okay.  How do you refer to this person?

23         **A.   In what way?  I mean, I just don't refer to them.**

24         Q.   Well --

25         **A.   What do you mean by that?**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   -- how are we to address this person or identify
2   this person in this deposition, because I'm going to ask
3   questions about him, whether -- you want to just call him
4   Doctor?
5     **A.   That's fine.**
6     Q.   Okay.  Now, does the protocol require a doctor to
7   be present?
8     **A.   It says a physician, nurse or emergency medical**
9   **person.**
10    Q.   Okay.  Well, I'm asking you, based on your
11  knowledge, you're free to look at this or you can depend on
12  your own experience with this, does the protocol require
13  the presence of a doctor?
14    **A.   It doesn't have to be a physician.**
15    Q.   Okay.  So it could be any one of those types of
16  persons listed there?
17    **A.   That's as I understand it.**
18    Q.   Okay.  Can you tell me why you need medical
19  personnel at an execution?
20    **A.   As I understand, this protocol has been approved**
21  **by the courts, and so it's required to have it according to**
22  **the Court.**
23    Q.   Okay.  Well, prior to this protocol being
24  approved by the Court, you had a doctor and a nurse, right?
25    **A.   Yes.**

Electronically signed by Shelly Stewart (401-194-331-8303)                              bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   Can you tell me your understanding of why a

2  doctor and/or a nurse need to be present?

3     **A.   I think the previous protocol also required that,**

4  **and the same issue occurred where there was a federal**

5  **lawsuit about that, to the best of my knowledge.**

6     Q.   Okay.  Can you tell me your understanding of why

7  a medical person or persons of some kind need to be present

8  during an execution?

9     **A.   Well, to set the lines on the person and also to**

10 **determine death.**

11    Q.   Okay.  Are those the only two reasons or are

12 there other reasons?

13    **A.   I can't recall any other reasons.**

14    Q.   Okay.  Are there drugs that are given prior to

15 the lethal injection drug?

16    **A.   Right.  There is the opportunity for a -- the**

17 **condemned to have a sedative and a doctor does administer**

18 **that if necessary.**

19    Q.   Is it a doctor or a nurse?

20    **A.   Nurse.**

21    Q.   Okay.  Is that sedative given pursuant to a

22 prescription?

23    **A.   I don't know that.**

24    Q.   Okay.  Do you know if there's a medical form that

25 is filled out?

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1       **A.    No.  I don't know that.**

2       Q.    So you've never seen a medical form?

3       **A.    No.**

4       Q.    Like a medical history form?

5       **A.    Yeah, I believe that is to occur, but I have not**

6   **seen that form, that I recall.**

7       Q.    Do you know who reviews that?

8       **A.    The protocol determines that, but I don't**

9   **remember the details of that.**

10      Q.    Do you know what the purpose of that form is?

11      **A.    No.  I don't know specifically about that.**

12      Q.    Do you know what tasks the nurse performs?

13      **A.    Not specifically.**

14      Q.    Do you know if the nurse puts in an IV?

15      **A.    I don't know that specifically.**

16      Q.    Do you know if the nurse has other nursing tasks?

17      **A.    I don't recall.  I don't know that specifically.**

18      Q.    Do you know if it's medical professionals who

19   have to administer the drugs that are involved here?

20      **A.    Administer?**

21      Q.    Uh-huh.

22      **A.    No.**

23      Q.    Okay.  What about dispense?

24      **A.    What do you mean by dispense?**

25      Q.    Prepare.

Electronically signed by Shelly Stewart (401-194-331-8303)                                   bed293be-8fc7-431e-b284-5910c8d127cd

1     **A.  Yes, I believe the medical personnel do prepare**

2  **the drugs.**

3     Q.  Okay.  Are they needed for that?

4     **A.  Yes, I believe that is one of their duties.**

5     Q.  So are you saying that medical personnel have to

6  prepare these drugs, not a nonmedical person?

7     **A.  Correct, best of my knowledge.**

8     Q.  Okay.  Does it have to be a doctor?

9     **A.  No.  I don't believe that's the case.**

10    Q.  So a nurse could prepare these drugs?

11    **A.  Yes.**

12    Q.  Could it be -- could it be the nurse that's now

13  on the team?

14    **A.  Yes, I'm sure.**

15    Q.  Okay.  Now, do you -- do you know that there are

16  three drugs used in the execution?

17    **A.  I do.**

18    Q.  What is the purpose of the first drug?

19    **A.  I believe the purpose of the first drug is to**

20  **render the person unconscious.**

21    Q.  Okay.  A sedative?

22    **A.  Yes.**

23    Q.  It sedates the person?

24    **A.  Yes.**

25    Q.  And used in a fairly significant dose; is that

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350  The LAKE 573-365-5226
Case 2:09-cv-04095-BP   Document 215   Filed 01/21/11   Page 39 of 126

Electronically signed by Shelly Stewart (401-194-331-8303)             bed293be-8fc7-431e-b284-5910c8d127cd

1    right?

2         A.   Yes.

3         Q.   Does the name sodium thiopental --

4         **A.   Yes, I believe that's the current drug.**

5         Q.   Okay.  Now, going back to the start of the

6    process, we discussed a sedative, would that be prior to

7    the sodium thiopental?

8         **A.   Yeah, that's somewhere early in the evening, as I**

9    **recall, if the inmate -- and it's the inmate's choice as to**

10   **whether he would like to have that or not.**

11        Q.   And the purpose of that drug is to reduce

12   anxiety?

13        **A.   You know, I'm not a medical person.  I can't tell**

14   **you exactly.**

15        Q.   I'm just asking --

16        **A.   I'm making assumptions.**

17        Q.   -- your knowledge.

18        **A.   Yes.**

19        Q.   Okay.  And so that is the therapeutic or medical

20   purpose for the use of that particular medication?

21        **A.   I think that's correct.**

22        Q.   Okay.  Now, the first drug of the three that is

23   used in the lethal injection you said renders the person

24   unconscious, right?

25        **A.   Yes.**

Electronically signed by Shelly Stewart (401-194-331-8303)                          bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   Okay.  And the purpose of that, being

2  unconscious, is to alleviate or remove pain and anxiety so

3  the person is not aware of what's going on?

4     **A.   To the best of my knowledge, that's true.**

5     Q.   Okay.  Now, what's your understanding of how that

6  drug is prepared and administered, that drug?

7     **A.   To the best of my knowledge, after the physician**

8  **has mixed the drug, it is administered by staff, and I**

9  **think three doses with a saline solution in between to**

10  **clear the lines.**

11     Q.   Okay.  The individuals, the Department employees

12  who are administering the drug, do they have any medical

13  training?

14     **A.   Not to my knowledge, but I don't know that**

15  **specifically.**

16     Q.   Is it basically four people carrying out the

17  execution, two medical and two nonmedical?

18     **A.   That's as I understand it, yes.**

19     Q.   And it's your understanding that the physician

20  mixes the drug, correct?

21     **A.   Yes.**

22     Q.   Does that involve preparing the syringe?

23     **A.   Yes, to the best of my knowledge.**

24     Q.   Do you know if anyone double-checks the

25  physician's preparation of the syringes as the physician is

Electronically signed by Shelly Stewart (401-194-331-8303)        bed293be-8fc7-431e-b284-5910c8d127cd

1   preparing them?

2       **A.   I don't know that.**

3       Q.   Do you know by what method a Department employee

4   or employees administers this drug?

5       **A.   Not specifically.**

6       Q.   What's your understanding of it?

7       **A.   I believe that they, in fact, push a plunger to**

8   **inject the drug.**

9       Q.   Is that into the person or into a line?

10      **A.   Into a line.**

11      Q.   Who trains departmental employees?

12      **A.   The employees that are involved in the process?**

13      Q.   Uh-huh.

14      **A.   It's overseeing -- the physician or the medical**

15   **personnel present oversee those individuals in that**

16   **particular part of their duty.**

17      Q.   Do you know who conducts the training for the

18   execution team?

19      **A.   Who conducts the training for the execution team?**

20      Q.   Uh-huh.

21      **A.   There is always a practice exercise that they go**

22   **through every part of the training, that includes everybody**

23   **that's involved in the process before an execution.**

24      Q.   Okay.

25      **A.   And that's overseen by the director of Adult**

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350   The LAKE 573-365-5226
Case 2:09-cv-04095-BP   Document 215   Filed 01/21/11   Page 42 of 126

Electronically signed by Shelly Stewart (401-194-331-8303)   bed293be-8fc7-431e-b284-5910c8d127cd

1    **Institutions.**

2        Q.   And who is that?

3        **A.   Tom Clements.**

4        Q.   Is that something that you did when you were in

5    that position?

6        **A.   Yes.   We usually had a practice exercise in**

7    **advance.**

8        Q.   That's something you oversaw?

9        **A.   Yes, in the generalist of sense.**

10       Q.   What do you mean in the generalist of sense?

11       **A.   I wasn't everywhere and everyplace during the**

12   **process.**

13       Q.   Who, if anyone, has trained the departmental

14   employees in how to inject drugs into an IV line?

15       **A.   I don't know who these specific employees were**

16   **trained by.   I just know that they were overseen by**

17   **whatever medical staff is present.**

18       Q.   Are they trained by medical staff during a

19   training?

20       **A.   I don't know what you mean by training.   I do**

21   **know that they oversee the folks doing it.**

22       Q.   Okay.   What does oversee involve?

23       **A.   You know, I can't be specific about that.   I**

24   **don't know exactly what happens.**

25       Q.   Now, do you know if individuals who have no

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    medical or nursing licensure of any kind are able, under

2    any law, to administer drugs such as the drugs used in the

3    lethal injection process?

4         **A.    I don't know that.**

5         Q.    Do you know if somebody needs to have some type

6    of medical licensure or certification to administer any of

7    the drugs used in the lethal injection, the process?

8         **A.    I have no knowledge of any of that.**

9         Q.    Who would have knowledge of that?

10        **A.    I don't know.**

11        Q.    I'm trying to keep up with you by taking notes,

12   because it actually makes the deposition more efficient.  I

13   hate getting an objection that says asked and answered.

14   And what that means is I'm asking you something I've asked

15   you before.  And so when I'm taking a couple of extra

16   seconds in writing something down, that's an effort to

17   keep -- for me to keep track of what I've asked you so I

18   don't have to re-plow some ground that I've already plowed

19   through.

20        **A.    That's fine.**

21        Q.    Okay.

22        **A.    Sure.**

23        Q.    So if you can bear with me through that.  I don't

24   usually do so much writing, but I'm trying to --

25        **A.    That's fine.**

Electronically signed by Shelly Stewart (401-194-331-8303)                              bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   -- be focused and efficient here.

2           If you could turn your attention again to

3   Exhibit 1.

4      **A.   Uh-huh.**

5      Q.   I would like to start at the top with execution

6   team members.  No. 1, the execution team consists of

7   contracted medical personnel and Department employees.

8      **A.   Uh-huh.**

9      Q.   Okay.  There is no specific number required

10   there; is that right?

11      **A.   Not in that sentence, no.**

12      Q.   Okay.  Under the protocol, could it be one of

13   each?

14      **A.   Excuse me?**

15      Q.   Under the protocol, I'm not asking about the

16   practice, but under this protocol, would it be sufficient

17   to have a team consisting of one medical person and one

18   Department employee?

19      **A.   There's nothing that prohibits it, that I'm aware**

20   **of, unless I read through here and find something**

21   **different.   That sentence doesn't prohibit it.**

22      Q.   Okay.  Do you want to take a minute and look

23   through the protocol?

24      **A.   No, I don't see anything in here that prohibits**

25   **what you just said.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                           bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  So looking at the protocol itself, it's --

2  what you're telling me is that the team at a particular

3  execution could be one of each, one medical person and one

4  nonmedical person?

5      **A.   Nothing here prohibits that.**

6      Q.   Okay.  Under No. 2 it says, a physician, a nurse

7  or pharmacist prepares the chemicals used during the lethal

8  injection.  Do you see that?

9      **A.   Yes.**

10     Q.   Has there ever been a pharmacist on the team?

11     **A.   Not to my knowledge, but I was not here during**

12  **four years and a half, so I don't know if anybody played**

13  **that role or not.**

14     Q.   Okay.  Is it your understanding under the

15  protocol that a nurse could prepare any of the drugs used

16  in the lethal injection?

17     **A.   Yes.**

18     Q.   Is it your understanding under the protocol that

19  a physician could prepare any of these drugs?

20     **A.   Yes.**

21     Q.   Okay.  Is it your understanding that a physician

22  or nurse could prepare any of these drugs without a

23  prescription being written by anyone?

24     **A.   Based on my previous comment, which is that we**

25  **have -- the information that I have is that the DEA and the**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1   **Missouri Health Department has approved the possession of**

2   **the drugs at ERDCC and are certified to use them.**

3       Q.   So your answer to that is yes?

4       **A.   Would you ask the question again, please?**

5            MS. PILATE:  Could you please read back my

6   question?

7            THE COURT REPORTER:  "Question:  Is it your

8   understanding that a physician or nurse could prepare any

9   of these drugs without a prescription being written by

10  anyone?"

11           THE WITNESS:  Yes.

12  BY MS. PILATE:

13      Q.   Okay.  And when I say any of these drugs, I mean

14  the drugs used in lethal injection?

15      **A.   Yes.**

16      Q.   And your answer is yes to that question?

17      **A.   Yes.**

18      Q.   Okay.  Going on to Paragraph 3, a physician,

19  nurse or emergency medical technician inserts intravenous

20  lines.  Do you see that?

21      **A.   Yes.**

22      Q.   Okay.  Now, is it your understanding that any one

23  of those three could insert IV lines?

24      **A.   Yes.**

25      Q.   Does that include a central line or peripheral

Electronically signed by Shelly Stewart (401-194-331-8303)   bed293be-8fc7-431e-b284-5910c8d127cd

1  line or both?

2      A.   **Whatever is being used at the time.  It's any**

3  **lines.**

4      Q.   Okay.  And could it be any kind of nurse?

5      A.   **To the best of my knowledge, yes.**

6      Q.   Okay.  Do you know what type of nurse is on the

7  execution team?

8      A.   **It's a registered nurse.**

9      Q.   Okay.  And you believe that person is licensed or

10  at least qualified to insert an IV line?

11      A.   **Yes.**

12      Q.   Okay.  And that would include a central line?

13      A.   **I don't know enough about the issue to say one**

14  **way or the other about that, but to the best of my**

15  **knowledge, yes.**

16      Q.   Okay.  The next thing states that the physician,

17  nurse or an EMT monitors the prisoner.  Do you see that?

18      A.   **Where are you?**

19      Q.   Paragraph 3.

20      A.   **Yes.**

21      Q.   It starts out the physician --

22      A.   **Yes.**

23      Q.   Okay.  The first thing was insert intravenous

24  line and then it's monitor the prisoner?

25      A.   **Right.**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   Okay.  And with regard to the intravenous line,

2  that is a medical activity, right?

3     **A.   Monitoring of the prisoner?**

4     Q.   No.  The inserting of the intravenous lines?

5     **A.   Yes.**

6     Q.   Okay.  That's a medical activity?

7     **A.   Yes.**

8     Q.   What does monitoring of the prisoner involve?

9     **A.   I really don't know the answer to that.  I don't**

10  **know.**

11     Q.   Okay.  Do you know if that is a medical activity?

12     **A.   I don't know.**

13     Q.   Okay.  Do you know if that involves checking for

14  consciousness at any point during the procedure?

15     **A.   To the best of my knowledge, once the sodium**

16  **thiopental is injected, then the medical person comes out**

17  **and checks the individual --**

18     Q.   Okay.  So that --

19     **A.   -- and makes sure they are, in fact, unconscious.**

20     Q.   Okay.  And that's a medical activity, right?

21     **A.   Yes.**

22     Q.   And do you know what they do to determine

23  consciousness?

24     **A.   I don't know specifically.**

25     Q.   Okay.  And then the next part of that sentence

Electronically signed by Shelly Stewart (401-194-331-8303)          bed293be-8fc7-431e-b284-5910c8d127cd

1  says that the physician, nurse or the EMT supervises the

2  injection of lethal chemicals by nonmedical members of the

3  execution team?

4      **A.   Correct.**

5      Q.   Okay.  Now, can you tell me what your

6  understanding is of what supervises means in that sentence,

7  the word supervises, how do they supervise them?

8      **A.   Well, they oversee the person while they're doing**

9  **it.**

10     Q.   Does that mean just watching?

11     **A.   Yes.**

12     Q.   Does it mean guiding or providing direction?

13     **A.   I have no idea specifically what happens in every**

14  **particular case about that.**

15     Q.   Okay.  Under the protocol, could these activities

16  be done by a physician or a nurse or an EMT?

17     **A.   Can what be done?**

18     Q.   What's listed in Paragraph 3.

19     **A.   Yes.**

20     Q.   Okay.  So any one of those three could supervise

21  the injection of the chemicals by a nonmedical member of

22  the execution team?

23     **A.   That's how I read this, yes.**

24     Q.   Okay.  Is it your understanding that the people

25  supervising the nonmedical members of the team are

Electronically signed by Shelly Stewart (401-194-331-8303)                                          bed293be-8fc7-431e-b284-5910c8d127cd

1    supervising them in tasks that they themselves could

2    perform?

3           MR. SPILLANE:  I'm going to object to the form of

4    the question.  I'm not sure what could means in that

5    context, whether could means legally or could means they

6    know how to do it.  I'm going to object to the form of the

7    question.

8    BY MS. PILATE:

9        Q.   Okay.  Is it your understanding that the persons

10   supervising the nonmedical members of the team, whoever

11   that is, they themselves are qualified by training and

12   scope of their practice to do those tasks themselves?

13       **A.   I don't know if they are or not.**

14       Q.   Okay.  Can you explain why someone who would not

15   be qualified would be supervising somebody else in doing

16   something when they themselves are not qualified to do it?

17       **A.   I didn't say they weren't qualified.  I said I**

18   **didn't know that they are.**

19       Q.   Well, what's your --

20       **A.   I mean, I -- go ahead.  I'm sorry.**

21       Q.   Can you tell me what your understanding is?

22       **A.   Yes.  That there is medical staff that oversee**

23   **the nonmedical staff in the actual administration of the**

24   **drugs.**

25       Q.   Okay.  What I'm asking you, maybe this will be

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    more clear, how is it that these medical personnel are

2    qualified to provide that supervisory oversight?

3         **A.    Because they have knowledge of how they -- how**

4    **drugs are to be administered.**

5         Q.    Okay.  So you're saying that they themselves have

6    the skills and qualifications to do this themselves and

7    they are merely supervising others in doing what they could

8    or, under other circumstances, would do?

9         **A.    Yes.  I suppose the answer to that is yes.**

10        Q.    Okay.  I'm not trying to be obscure here.

11        **A.    Okay.**

12        Q.    So your answer is yes?

13        **A.    Yes, I believe so.**

14        Q.    Okay.  If there was only one medical person

15   available at a given institution -- or given execution, for

16   whatever reason, could the execution proceed with one

17   medical person?

18        **A.    Yes.**

19        Q.    Okay.  And it could proceed with either the

20   physician, the nurse or an EMT, if you have one?

21        **A.    According to this protocol.**

22        Q.    Okay.  Turning to No. 4, do you know why it says,

23   two Department employees inject the chemicals into the

24   prisoner?  Do they have different roles, the same role, do

25   you know how they accomplish that?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    A.   I don't know specifically.

2    Q.   Other than their involvement in executions, these

3  departmental employees, do you know if they have any other

4  medical or medical-type responsibilities in their jobs?

5    A.   Not to my knowledge.

6    Q.   They are employees of the Department of

7  Corrections; is that right?

8    A.   They are.

9    Q.   And they work at a facility or facilities, I'm

10  not going to ask you which one, but they work at a

11  Department of Corrections facility of some kind?

12    A.   They can, but they don't have to be.

13    Q.   Okay.  So it can be anyone either in

14  administration or working at a facility?

15    A.   Correct.  It says departmental employees and that

16  can mean anyone in the Department.

17    Q.   Okay.  To your knowledge, have the same

18  departmental employees been involved in executions over the

19  years or has that responsibility been passed around?

20    A.   I don't know that.

21    Q.   Do you know who's assigned to the team at

22  present?

23    A.   I do.

24    Q.   And do you know if these persons have been

25  involved in executions in the past?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    **A.    I only know about the past executions when I was**

2    **here.  And again, I have no idea about the four years I was**

3    **gone.**

4         Q.   Okay.  Well, are they the same people who were

5    involved in the past?

6    **A.    Before the four years?**

7         Q.   Yeah.

8    **A.    I don't believe that's the case.**

9         Q.   Okay.  So you think they might be different?

10   **A.    I think they might be, but, you know, I don't**

11   **remember.**

12        Q.   When did you leave the Department in 2005?

13   **A.    February.**

14        Q.   And are you aware there were other executions

15   throughout the remainder of 2005?

16   **A.    Yeah.  I don't specifically remember, but I know**

17   **executions occurred during my absence.**

18        Q.   So you would be aware that you have missed some

19   executions?

20   **A.    Yes.**

21        Q.   Okay.  The two employees that are the team now,

22   departmental employees, do you know if they have been

23   involved in any executions?

24   **A.    Yes, I think they have.**

25        Q.   Okay.  Were they involved in the execution -- the

Electronically signed by Shelly Stewart (401-194-331-8303)    bed293be-8fc7-431e-b284-5910c8d127cd

1    one execution that took place in '09?

2         A.   Yes.

3         Q.   Have they been involved in any other executions

4    other than that?

5         A.   **I don't know that.**

6         Q.   You don't know?

7         A.   **No.**

8         Q.   Okay.  The doctor that is with the team now, do

9    you know if he was involved in the execution that occurred

10   in '09?

11        A.   **To the best of my knowledge, yes.**

12        Q.   And he's still with the execution team?

13        A.   **Yes.**

14        Q.   Has he been involved in any executions other than

15   the one that occurred in 2009?

16        A.   **I don't know that.**

17        Q.   As far as the nurse who is involved with the

18   execution team, do you know how long that nurse has been

19   with the execution team?

20        A.   **To my knowledge, quite sometime.**

21        Q.   Would that individual have been involved with

22   more executions than the other members of the team?

23        A.   **Than the other members of the team currently?**

24        Q.   Uh-huh.

25        A.   **To the best of my knowledge, that would be true.**

Electronically signed by Shelly Stewart (401-194-331-8303)

1    Q.   Okay.  Can you tell me generally how the

2    Department went about finding a doctor to join the

3    execution team?

4    **A.   No, because that happened before I got here and I**

5    **don't recall that.**

6    Q.   Okay.  Do you know if this doctor is an

7    anesthesiologist?

8    **A.   I believe that's the case.  I don't know though.**

9    **I really don't know specifically, but I think he is.**

10    Q.   Okay.  Who would have that information?

11    **A.   Probably Mr. Clements.**

12    Q.   Who has the most contact with the execution team?

13    **A.   He does.**

14    Q.   Who is responsible for hiring or supervising

15    members of the execution team?

16    **A.   He is.**

17    Q.   Who is responsible for training members of the

18    execution team?

19    **A.   He is as well.**

20         MS. PILATE:  Okay.  This would be a good place to

21    take a short morning break and then we'll come back and go

22    for another hour or so and then take a lunch break.

23         (A BREAK WAS TAKEN.)

24    BY MS. PILATE:

25    Q.   We're returning to Deposition Exhibit 1.  I think

Electronically signed by Shelly Stewart (401-194-331-8303)    bed293be-8fc7-431e-b284-5910c8d127cd

1   we've been all the way through Subpart A.  Let's go on

2   to B.  Preparation of chemicals, it says medical personnel

3   prepare the lethal chemicals.  Now, is it your

4   understanding, based on the protocol, that any of the

5   personnel listed in Subpart A, the physician, nurse or EMT

6   or pharmacist, could prepare the chemicals?

7       **A.   Yes.**

8       Q.   Okay.  Then it says the quantity of these

9   chemicals may not be changed without prior approval of the

10  department director.  Is that you?

11      **A.   It is.**

12      Q.   Okay.  Now, under what circumstances would you

13  change the quantities?

14      **A.   I wouldn't.**

15      Q.   Has the Department ever considered going to a

16  single-drug method?

17      **A.   We have not.  Well, I say that.  We have not**

18  **since I've been director.**

19      Q.   Has anyone ever suggested a different method of

20  execution?

21      **A.   No, not during my tender as director.**

22      Q.   Have any changes in the execution methods or

23  protocol of any kind been considered since you've been

24  director?

25      **A.   No.**

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Okay.  Subparagraph 2 concerns the sodium

2    pentothal or thiopental, correct?

3    **A.   Yes.**

4    Q.   Do you know why it's prepared in four different

5    syringes?

6    **A.   I really don't.**

7    Q.   Okay.  Do you know what is done to prepare those

8    syringes?

9    **A.   No.**

10   Q.   Okay.  Going to Paragraph 3 with the saline

11   solution, what is the purpose of the saline?

12   **A.   I don't have any knowledge of that.  I'm making**

13   **an assumption that it is to clear the lines, but I really**

14   **don't know that.**

15   Q.   Okay.  Paragraph 4 then makes reference to

16   60 milligrams of pancuronium bromide.  Do you know what

17   pancuronium bromide is?

18   **A.   I don't know specifically, although I've been**

19   **informed that the purpose of is it to stop respiration.**

20   Q.   Do you know if it has paralyzing affects?

21   **A.   I don't know anything more than that.**

22   Q.   Okay.  Who told you it stops respiration?

23   **A.   I don't recall.**

24   Q.   Have you ever heard that drug referred to as a

25   paralytic?

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    **A.    No.   No, I haven't.**

2    Q.    If that drug stops respiration, then do you know

3  why a third drug would be given?

4    **A.    The third drug purpose is to stop the heart, to**

5  **the best of my knowledge.**

6    Q.    Do you know how the second drug stops

7  respiration?

8    **A.    Do I know how it stops respiration, no.**

9    Q.    Do you know if it's a muscle relaxant?

10    **A.    I don't know anything more than what I said.**

11    Q.    Do you know why this second drug is given instead

12  of just going for a drug that would stop the heart?

13    **A.    I do not.**

14    Q.    Do you know if it would be effective to go

15  straight from Drug No. 1 to Drug No. 3?

16    **A.    I have no idea.**

17    Q.    Do you know if it would be effective to stop at

18  Drug No. 2?

19    **A.    No, I don't know that.**

20    Q.    So you have no knowledge?

21    **A.    No, I don't.**

22    Q.    Okay.  Do you know if it would be effective to

23  stop at Drug No. 1?

24    **A.    No, I do not.**

25    Q.    Is it your understanding that the purpose of Drug

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1   No. 1 is simply to induce unconsciousness?

2      **A.  That's as I understand it.**

3      Q.  Is the drug that is listed in Paragraph 6,

4   potassium chloride, is that the drug, to your

5   understanding, that stops the heart?

6      **A.  Yes.**

7      Q.  Okay.  Do you know how long it takes to do that?

8      **A.  I do not.**

9      Q.  Do you know anything about whether the first drug

10  is a long-acting or short-acting drug?

11     **A.  I don't know any more details than what I've**

12  **already shared with you about those drugs.**

13     Q.  Do you know anything else about those drugs other

14  than what is written here?

15     **A.  No.**

16     Q.  Do you know what -- turning to Paragraph 8, do

17  you know what Syringes 1A, 2A and 3A and 4A are for?

18     **A.  It says each containing 1.25 grams thiopental.  I**

19  **mean, it reads what it reads there.**

20     Q.  Okay.

21     **A.  Yes.**

22     Q.  Do you know why you need a -- or why there is a

23  provision here for a second set of syringes with sodium

24  thiopental?

25     **A.  I do not know.**

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350  The LAKE 573-365-5226
Case 2:09-cv-04095-BP  Document 215  Filed 01/21/11  Page 60 of 126

Electronically signed by Shelly Stewart (401-194-331-8303)

1      Q.    Okay.  Turning to the Subpart C, it says

2    intravenous lines.

3      **A.    Uh-huh.**

4      Q.    And again, that says medical personnel determine

5    the most appropriate locations for intravenous lines.  Do

6    you see that?

7      **A.    I do.**

8      Q.    Okay.  And it doesn't specify a particular

9    medical personnel, does it?

10      **A.    It does not.**

11      Q.    So to your knowledge, could that be the

12    physician, the nurse or the EMT?

13      **A.    Yes, to the best of my knowledge, that's the**

14    **case.**

15      Q.    Okay.  Do you know what a primary line is and a

16    secondary line?

17      **A.    Other than what I read here, no.**

18      Q.    Okay.  Is it your understanding that any one of

19    the medical personnel could perform any of the activities

20    listed in this paragraph?

21      **A.    Yes, I believe that's so.**

22      Q.    Okay.  Turning to Subparagraph D where it says

23    monitoring of the prisoner?

24      **A.    Yes.**

25      Q.    And where it says medical personnel attach the

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    leads from the electrocardiograph to the prisoner's chest

2    and then check the electrocardiograph to determine it is

3    functioning, could that be the doctor, the nurse or the

4    EMT?

5        **A.    Any of the medical personnel subscribed, yes.**

6        Q.    Okay.  And gurney is positioned so that medical

7    personnel can observe the prisoner's face directly or with

8    the aid of a mirror?

9        **A.    Yes.**

10       Q.    Do you see that?

11       **A.    Yes.**

12       Q.    And could that be any of the medical personnel?

13       **A.    Yes.**

14       Q.    And No. 3, medical personnel monitor the

15   electrocardiograph and the prisoner during the execution.

16   Could that be any of the medical personnel?

17       **A.    As I understand it, yes.**

18       Q.    Okay.  Are some of the tasks that the medical

19   personnel or the medical person are performing during the

20   execution traditional medical tasks in terms of trying to

21   calm anxiety with a sedative and make the prisoner

22   comfortable and prepared for the procedure?

23       **A.    Yes, I believe they do play those roles.  Yes, I**

24   **do.**

25       Q.    Okay.  Now, we're down to E, administration of

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    chemicals, upon order of the Department director, would

2    that be you?

3         **A.    Yes.**

4         Q.    Okay.  And then it says the chemicals are

5    injected into the prisoner by execution team members under

6    the observation of medical personnel.  Does that mean

7    nonmedical personnel do the injection?

8         **A.    Yes.**

9         Q.    Okay.  Although this doesn't specify, it says

10   execution team members who could be medical or nonmedical,

11   right?

12        **A.    Well, protocol indicates that the nonmedical**

13   **staff do that.**

14        Q.    Okay.  But that sentence may be a little less

15   clear; is that right?

16        **A.    Depends on how you want to interpret it, I**

17   **suppose.**

18        Q.    Okay.  Do you see at the top of the next page,

19   Paragraph 2, where it says the thiopental is injected from

20   Syringes 1, 2, 3 and 4?

21        **A.    Uh-huh.**

22        Q.    Okay.  Do you know if medical personnel are

23   required to note the time that they inject each syringe?

24        **A.    I believe that's the case, but I'm not**

25   **specifically positive, but I think that is the case.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                                    bed293be-8fc7-431e-b284-5910c8d127cd

1     Q.   Okay.  Under three, Paragraph 3, it says before

2     the second and third chemicals are injected, medical

3     personnel physically examine the prisoner to confirm he is

4     unconscious?

5          **A.   Yes.**

6     Q.   Do you see that?

7          **A.   Yes.**

8     Q.   And again, could that be any of the medical

9     personnel?

10         **A.   Yes, to my knowledge.**

11    Q.   Okay.  And then again, under Paragraph 4, do you

12    see another reference to, if necessary, more syringes being

13    injected and the medical personnel confirming the prisoner

14    is unconscious as stated in the paragraph above?

15         **A.   Yes.**

16    Q.   Okay.  And again, that could be any of your

17    medical personnel?

18         **A.   Yes.**

19    Q.   In Paragraph 5 it states, after confirming that

20    the prisoner is unconscious, the second and third chemicals

21    are injected provided at least three minutes have elapsed

22    since the execution team members started injecting the

23    thiopental which rendered the prisoner unconscious.  Do you

24    see that?

25         **A.   Yes.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                                          bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Do you know what the reason is for the

2   three-minute time span there?

3      **A.   I do not.**

4      Q.   No. 6, it says the pancuronium bromide in Syringe

5   No. 6 is injected into the prisoner.  Do you see that?

6      **A.   I do.**

7      Q.   And do you have any familiarity with what the

8   amount of 60 milligrams would accomplish?

9      **A.   No, I do not.**

10      Q.   Do you know anything about the pancuronium

11   bromide other than what you have previously told us?

12      **A.   I do not.**

13      Q.   Okay.  Then Paragraph 8, it states the potassium

14   Chloride in Syringes 8 and 9, parentheses, 240

15   milliequivalents is injected.  Do you see that?

16      **A.   I do.**

17      Q.   Do you have any knowledge of the significance of

18   that dose?

19      **A.   I do not.**

20      Q.   Okay.  Do you know anything about the potassium

21   chloride other than what you have previously told us?

22      **A.   I do not.**

23      Q.   Paragraph 10, if the electrical activity of the

24   prisoner's heart does not cease within five minutes,

25   additional potassium chloride is injected to cause death.

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1    Do you see that?

2         **A.   I do.**

3         Q.   Okay.  Do you know if there is some possibility

4    that 240 milliequivalents would not accomplish death?

5         **A.   I do not.**

6         Q.   Then it says in No. 11, when all electrical

7    activity of the heart as shown by the electrical ends --

8    excuse me.  Let me start that again.

9              When all electrical activity of the heart ends as

10   shown by the electrocardiogram, medical personnel pronounce

11   death.  Do you see that statement?

12        **A.   I do.**

13        Q.   And does that reference to medical personnel

14   refer to any of the medical members of the team as we've

15   previously discussed?

16        **A.   To my knowledge.**

17        Q.   Okay.  So any of them could do that?

18        **A.   Yes.**

19        Q.   Okay.  Turning to the next page, do you see the

20   Subpart F, documentation of chemicals?

21        **A.   Yes.**

22        Q.   Okay.  It says, No. 1, medical personnel properly

23   dispose of unused chemicals?

24        **A.   Yes.**

25        Q.   Okay.  And could that be any member -- medical

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    member of the team?

2          **A.    Yes.**

3          Q.    How are unused chemicals disposed of?

4          **A.    I do not know.**

5          Q.    In Paragraph 2, there's a reference to a sequence

6    of chemicals form, have you ever seen that?

7          **A.    I don't recall seeing it.**

8          Q.    Do you know -- well, strike that.

9                You have no familiarity with that form; is that

10   right?

11         **A.    I don't remember it, no.**

12         Q.    Okay.  I think that's all I have on that protocol

13   or at least on that exhibit.

14         **A.    Can I take a break for just one minute?**

15         Q.    Sure.

16               (A BREAK WAS TAKEN.)

17   BY MS. PILATE:

18         Q.    Okay.  Going back earlier to something you said,

19   you said the Department had some kind of approval from the

20   DEA?

21         **A.    That's as I understand it.**

22         Q.    Okay.  What is your understanding of what that

23   approval is?

24         **A.    It's the certification that allows us to have**

25   **possession -- allows the facility to have possession of**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    **those drugs to use in a variety of ways.**

2         Q.   Okay.  Let's see if I can -- make sure I've got

3    this down.  The DEA certification allows a facility to have

4    possession of the drugs to use in a variety of ways; is

5    that correct?

6         **A.   That's as I understand it.**

7         Q.   Okay.  Does this certification apply to all drugs

8    or just those used in lethal injection?

9         **A.   I don't know about all drugs, but I know it**

10   **applies to the lethal injection drugs.**

11        Q.   Does it apply to all three drugs?

12        **A.   To the best of my knowledge.**

13        Q.   And if the facility has this certification, does

14   any individual medical person have to have any additional

15   certification?

16        **A.   I'm not aware of that.**

17        Q.   Now, returning to the doctor on the team, you

18   thought he was an anesthesiologist, but you weren't sure?

19        **A.   Yes, I think he is an anesthesiologist.**

20        Q.   Do you know if he's board certified as an

21   anesthesiologist?

22        **A.   I don't know the details of his background.**

23        Q.   Have you ever seen a license or certificate of

24   his?

25        **A.   No, I have not.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                          bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  Do you know if he has any kind of

2  registration, license or certification with the DEA?

3      **A.   I have no idea.**

4      Q.   Do you know whose responsibility it would be, if

5  anyone, to know that?

6      **A.   I believe the director of institutions at the**

7  **present time has knowledge of his background.**

8      Q.   Is that Mr. Clements?

9      **A.   Yes.**

10     Q.   Now, you also mentioned the Missouri Health

11  Department, what is the role of the Missouri Health

12  Department in this?

13     **A.   To my knowledge, they also do some type of**

14  **certification for the use of the drugs, but I don't know in**

15  **great detail about that.**

16     Q.   Okay.  So you think they're involved in issuing

17  some kind of approving document, but you don't know what

18  that is?

19     **A.   Yes, exactly.**

20     Q.   Do you know if it is disclosed or has been

21  disclosed to either the DEA or the Missouri Health

22  Department what the drugs are used for?

23     **A.   I do not know that.**

24     Q.   Is it your understanding that if these approvals

25  are obtained from the DEA and the Missouri Health

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1   Department, then it doesn't matter as to any certification

2   of any individual practitioner, that they don't need

3   anything additional?

4       **A.   That is my understanding, but I don't know that**

5   **specifically.**

6       Q.   Okay.  And whose job would it be to know that?

7       **A.   Know what?**

8       Q.   Know whether or not the individuals would need

9   any of their own certifications?

10      **A.   Either Mr. Clements or our counsel.**

11      Q.   Okay.  Has anyone ever advised you about that?

12      **A.   No.  You know, the issue is that all the protocol**

13  **was established before I came here, and it was accepted, as**

14  **I understood, by the Court, and so we just moved forward**

15  **when I came here with the same protocol.**

16      Q.   So if a court looking at any portion of this

17  protocol said, for instance, that this particular paragraph

18  or subparagraph violated a particular law, is that

19  something that would be addressed?

20      **A.   I think I talked about that before.  That's a**

21  **hypothetical and, you know, we would take it under -- we**

22  **think we are in concert with the law and we would take that**

23  **under the advice of counsel.**

24      Q.   Okay.  Well, I understand that you think you're

25  in compliance with the law, but if the Court were to issue

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    a ruling to the contrary as to any point, would the

2    Department take steps to bring itself into compliance with

3    the law?

4        **A.   Whatever the Court ruled, we would take it under**

5    **counsel's advice as to what would happen next.**

6        Q.   Is there any reason why, for instance, the

7    Department could not have a doctor write prescriptions if

8    the Court said that law required that?

9        **A.   That's a hypothetical and I have the same exact**

10   **answers as I had previously.**

11       Q.   Well, it's -- I'm asking you a little bit

12   different question.  I'm saying is there any reason the

13   Department could not have prescriptions written for these

14   drugs?

15       **A.   We believe it's not necessary based on what I've**

16   **said before about the certification from DEA.**

17       Q.   But what I'm asking you is:  Could it be done?

18       **A.   I have no idea.  It's not necessary.  You're**

19   **asking a hypothetical again, could it be done, in my**

20   **estimation.**

21       Q.   Do you know of any reason it could not be done?

22       **A.   Again, I go back to the fact that we don't**

23   **believe it's necessary.**

24       Q.   No.  I understand that.  But that's not what I'm

25   asking.  Sitting here today, can you point to anything that

Electronically signed by Shelly Stewart (401-194-331-8303)

1   would prevent the issuance of prescriptions?

2       **A.   It's not necessary.   I go back to what I said**

3   **before.   I mean, it's a hypothetical.**

4       Q.   But that's not my question.   I'm asking you if

5   you're aware of any fact or circumstance that would prevent

6   the writing of prescriptions?

7       **A.   I have no idea about that issue.**

8       Q.   Okay.

9           MS. PILATE:   I need a sticker.

10          (PETITIONERS' DEPOSITION EXHIBIT NO. 2 WAS MARKED

11  FOR IDENTIFICATION BY THE COURT REPORTER.)

12  BY MS. PILATE:

13      Q.   I'm going to hand you a document that I've marked

14  as Deposition Exhibit 2 and ask you if you've seen that

15  before?

16      **A.   I have.**

17      Q.   And what is this, please?

18      **A.   This is the interrogatory on this particular case**

19  **and my responses.**

20      Q.   Okay.  Is this a document that -- in which you

21  prepared the answers yourself, or did someone else prepare

22  them and you reviewed them and signed off on them?

23      **A.   I prepared it in concert with counsel.**

24      Q.   Could you please turn to Interrogatory Answer

25  No. 1?

Electronically signed by Shelly Stewart (401-194-331-8303)                bed293be-8fc7-431e-b284-5910c8d127cd

1     **A.   Okay.**

2     Q.  Do you see No. 1?

3     **A.   I'm getting there.  Here we go.**

4     Q.  Okay.  Do you see at the bottom of the page that

5  there's an objection to No. 1.  And then if you turn the

6  page, there is an answer where it states, upon information

7  and belief I believe the Department of Corrections is

8  already acting in accordance with federal law.  Do you see

9  that?

10    **A.   Yes.**

11    Q.  Do you know what federal law the Department is

12  acting in accordance with?

13    **A.   Whatever the previous case law has been on this**

14  **particular instance.  No, I don't know the specific law**

15  **that I can state it, no.**

16    Q.  Okay.  Do you know if the Department is acting in

17  accordance with State law?

18    **A.   To the best of my knowledge, yes.**

19    Q.  Okay.  It then says, the Department of

20  Corrections will seek legal advice of its general counsel

21  in the Attorney General's Office to determine an

22  appropriate course of action after the Court rules.  Do you

23  see that?

24    **A.   I do.**

25    Q.  Okay.  Would you agree that that's a different

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350  The LAKE 573-365-5226
Case 2:09-cv-04095-BP   Document 215   Filed 01/21/11   Page 73 of 126

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1  answer than stating the Department of Corrections would not

2  take any action to change its protocol?

3      **A.    Excuse me?**

4      Q.    Okay.  Let me see if I can make it a little

5  simpler here.

6          In this answer here would you agree that you are

7  not simply shutting down the possibility of making a

8  change, you're not saying, absolutely the Department of

9  Corrections will make no changes and do nothing regardless

10  of what the Court says, you agree with that?

11      **A.    Yes.**

12      Q.    Okay.  You're not saying that?

13      **A.    Now you have me confused.  I'm not saying what?**

14      Q.    What I just said.

15      **A.    Let me try to answer what you just said.  If the**

16  **Court found adversely to us in terms of how we see it, then**

17  **we would take that on to advice of counsel.  And no, I**

18  **would not rule out a change providing that this is --**

19  **counsel and the Department determined there should be a**

20  **change.**

21      Q.    Okay.

22      **A.    Okay?**

23      Q.    That's fine.  That's the only question I wanted

24  you to answer there.

25      **A.    Okay.**

Electronically signed by Shelly Stewart (401-194-331-8303)                              bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  Let's go on to No. 2.  I asked you about

2  members of the -- or the current members of the execution

3  team.  Do you see that?

4      A.   Uh-huh.

5      Q.   Okay.  We've got Medical Team Member M2,

6  contracted medical member; Medical Team Member M3,

7  contracted medical member.  Is it your understanding that

8  that's a doctor and a nurse?

9      A.   Yes, to the best of my knowledge.

10     Q.   Okay.  And the nonmedical team members, NM1 and

11  NM2 are the people that we previously were discussing?

12     A.   Yes.

13     Q.   Okay.  And they are the people who are

14  responsible for actually injecting the drugs into the

15  lines; is that right?

16     A.   Correct.

17     Q.   And at present the Department of Corrections has

18  two of those people on the team?

19     A.   Yes.

20     Q.   Okay.  Okay.  Turning to No. 4.

21     A.   No. 4?

22     Q.   Yeah.

23     A.   Okay.

24     Q.   If you could please take a second and review that

25  question and that answer, I want to ask you a couple of

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1  questions about it.

2       **A.   Okay.   Yes.**

3       Q.   Okay.   Now, this is a question -- I'll read the

4  question.

5            Are the person(s) identified in response to

6  No. 3(d), which asked about execution team members licensed

7  or registered under federal or state law to administer the

8  lethal injection drugs.  Do you see that?

9       **A.   I do.**

10      Q.   Okay.  Do you agree that the response talks

11  simply about the certificates held by the facility, the

12  ERDCC?

13      **A.   If you go to the next page, it says the**

14  **institution team members are covered under the above**

15  **registration as agents of the Missouri Department of**

16  **Corrections, yes.**

17      Q.   Okay.  So it's your understanding that any

18  registration, certificate or licensure held by any

19  individual is irrelevant because everybody is covered by

20  the certificate that is noted here in response to No. 4?

21      **A.   Yes.**

22      Q.   That's your answer?

23      **A.   Yes.**

24      Q.   Okay.  Okay.  Could you please review No. 5?

25      **A.   Okay.**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  Now, you would agree that this

2   interrogatory asks about persons licensed by law to

3   administer, dispense or prescribe the drugs used in a

4   lethal injection, correct?

5      **A.   Yes.**

6      Q.   Okay.  And this asked about the type of license

7   held and what the license authorizes the license holder to

8   do, et cetera.  Do you agree with that?

9      **A.   Correct.**

10      Q.   And you would agree that your answer stated that

11   the certification held by the ERDCC with the Department of

12   Justice slash DEA was the authority that the Department is

13   proceeding under and that no further authority was needed

14   to prescribe or dispense these drugs?

15      **A.   I do.**

16      Q.   Is that what you're saying?

17      **A.   Yes.**

18      Q.   Okay.  So any other certification or license or

19   registration is irrelevant to the ability of any individual

20   to prescribe, administer or dispense these drugs; is that

21   right?

22      **A.   Yes, it's not necessary based on the law that we**

23   **understand.**

24      Q.   Okay.  So that's your answer?

25      **A.   Yes.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                          bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   So nothing beyond the certificate held by the

2    facility is necessary in any way to prescribe or dispense

3    these drugs, is that what you're saying?

4        **A.   A prescription is not necessary, but the use of**

5    **it is covered by this.**

6        Q.   Okay.  Well, what I'm asking in No. 5, I'm asking

7    about administering, dispensing or prescribing.  Do you see

8    Line 2 of Interrogatory No. 5?

9        **A.   Yes.**

10       Q.   Okay.  And are you saying here that the

11   certificate held by the ERDCC covers all of these

12   activities, administering, dispensing and prescribing, with

13   respect to each of the drugs used in the lethal injection

14   process?

15       **A.   Yes.**

16       Q.   And that no further licensure, certification or

17   registration is needed by any individual person?

18       **A.   Yes.**

19       Q.   Okay.  Okay.  And looking at No. 6, do you see

20   where that interrogatory is?

21       **A.   Yes.**

22       Q.   Asking to identify all members of the execution

23   team, if any, who are registered to dispense sodium

24   pentothal, a Schedule III controlled substance, and state

25   whether the person is physically present during the

Electronically signed by Shelly Stewart (401-194-331-8303)

1    execution.  Do you see what the answer is there, see

2    answers to Interrogatories 3a, 4 and 5?

3         **A.    Right.**

4         Q.    And are you saying in your answer to this that

5    the certification held by the facility covers the

6    dispensing of the sodium pentothal and no further

7    registration, license or certificate is needed by any

8    individual person?

9         **A.    Yes.**

10        Q.    Okay.

11               (AN OFF-THE-RECORD DISCUSSION WAS HELD.)

12   BY MS. PILATE:

13        Q.    Okay.  Going over Interrogatory No. 7, if a

14   member of the execution team is registered to dispense

15   Schedule III controlled substances, to what degree does

16   that person supervise or direct medical and nonmedical

17   personnel to inject the drugs?  Do you see that?

18        **A.    Yes.**

19        Q.    Okay.  The answer is, medical team members of the

20   execution team observe the nonmedical team members as they

21   inject the prisoner with the lethal injection chemicals.

22        **A.    Yes.**

23        Q.    Okay.  I can't really -- the answer does not

24   address something, so I'm just going to ask you here, are

25   you saying that any medical team member can observe or

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    supervise any nonmedical team member and that everybody is

2    covered by the facility's certification and it does not

3    matter if that individual member is registered to dispense

4    Schedule III controlled substances?

5        **A.    Yes.**

6        Q.    Okay.  No. 8, identify all persons currently

7    responsible for purchasing or procuring the lethal

8    injection drugs.  And Martha Pritchett is listed, how many

9    years has she done that?

10       **A.    I have no idea.**

11       Q.    Okay.  Do you have any knowledge of the

12   purchasing or procurement process for lethal injection

13   drugs?

14       **A.    I really don't.**

15       Q.    Do you know if they are bought wholesale or

16   retail?

17       **A.    I don't have detail about that.  I don't**

18   **remember.**

19       Q.    Do you know if they are bought in state or out of

20   state?

21       **A.    I think there has been both.**

22       Q.    Do you know if in the process of purchasing the

23   drugs, that the purpose of for which the drugs are

24   purchased needs to be disclosed?

25       **A.    I have no information if that's the case, no.  I**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    **don't know that, no.**

2         Q.    Okay.   No. 9 asks for all licenses held by any

3    Department of Corrections facility that relate to the

4    purchase or procurement of the lethal injection drugs.

5    Okay.  And in your answer you reference me back to the

6    answers to Interrogatories 4 and 5.  Do you see that?

7         **A.    Yes, I do.**

8         Q.    And does that mean that for the purchase and

9    procurement that what the Department is relying on is the

10   facility license held by the ERDCC?

11        **A.    Correct.**

12        Q.    Okay.   No. 10 asks, identify all persons involved

13   with drafting, reviewing or promulgating the Department of

14   Corrections' current execution protocol.  And you state

15   here you lack personal knowledge?

16        **A.    I do.**

17        Q.    Okay.   Under the civil procedure rules, you have

18   some obligation to conduct inquiry and it looks like you

19   did so, and there is a further answer there.  Do you see

20   that?

21        **A.    Right.**

22        Q.    And you state, upon information and belief that

23   you believe former Director Larry Crawford and former

24   General Counsel C. Daniel Gibson, worked closely with the

25   Attorney General's Office in drafting the protocol.  Do you

Electronically signed by Shelly Stewart (401-194-331-8303)                                         bed293be-8fc7-431e-b284-5910c8d127cd

1    see that?

2        **A.   I do.**

3        Q.   Okay.  Do you know if an individual named Michael

4    Pritchett with the Attorney General's Office was involved

5    in the drafting?

6        **A.   No, I don't know specifically.  Don't know who it**

7    **was.**

8        Q.   You also mentioned Tom Clements here.  Do you

9    believe he was involved with the drafting?

10       **A.   As it states here, incorporating the protocol**

11   **into Department procedure.**

12       Q.   Who do you believe would be most knowledgeable

13   about how the protocol was drafted?

14       **A.   I think the individuals that are listed here,**

15   **Crawford or Gibson or somebody in the Attorney General's**

16   **Office or a combination of those folks.**

17       Q.   Okay.  Have you ever heard of an individual named

18   Mark Dershwitz, D-e-r-s-h-w-i-t-z?

19       **A.   No.**

20       Q.   You don't know who he is?

21       **A.   No.**

22       Q.   Okay.  Turning to No. 11, it asks about the FDA,

23   whether it's reviewed and approved these drugs.  Do you see

24   that?

25       **A.   I do.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  And did you personally make inquiry to

2   obtain your answer for that?

3      **A.   This was provided by counsel for me.**

4      Q.   Okay.  Did you make any contact with Annamarie

5   Kempic?

6      **A.   I did not.**

7      Q.   Okay.  Would you agree that this states here that

8   these drugs are not approved for use in lethal injections?

9      **A.   Yes.**

10      Q.   Now, if a drug is not approved for a particular

11   purpose, do you know anything about what needs to be done

12   in order for that drug to be legally used?

13      **A.   I do not.**

14      Q.   No. 12 asks for suppliers and five are listed, do

15   you have any personal knowledge of any of them?

16      **A.   I don't.**

17      Q.   Turning to No. 13, I -- we asked for the identity

18   of the manufacturers of lethal injection drugs.  Do you see

19   that?

20      **A.   I do.**

21      Q.   Have you ever heard of a company named Hospira?

22      **A.   Who?**

23      Q.   Hospira, H-o-s-p-i-r-a.

24      **A.   I -- no, I not know that company.**

25      Q.   Okay.  No. 14, you were asked about whether the

Electronically signed by Shelly Stewart (401-194-331-8303)           bed293be-8fc7-431e-b284-5910c8d127cd

1    Department of Corrections had considered other methods of

2    execution or other protocols?

3        **A.    Yes.**

4        Q.    And you state that during the time you've been

5    director, the Department has not considered returning to

6    execution by lethal gas, correct?

7        **A.    Correct.**

8        Q.    And no longer has the ability to carry out

9    executions in that manner?

10       **A.    Correct.**

11       Q.    And to your knowledge, there has not been any

12    effort to change the current protocol with regard to lethal

13    injection; is that right?

14       **A.    Correct.**

15       Q.    Is that correct?

16       **A.    Yes, ma'am.    Yes.**

17       Q.    Now, we talked earlier about sedatives are used

18    in the -- let's back up a minute, because that opens up a

19    whole new thing.

20            I wanted to ask you one question about the DEA

21    and the Missouri Health Department.    Do you know where you

22    obtained the knowledge that the registration or

23    certification from the DEA was sufficient to cover the acts

24    of execution and lethal injection here?

25       **A.    From counsel.**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   So to your knowledge, what the Department is

2  relying on is No. 1, the DEA certification, and secondly,

3  some type of approval from the Missouri Health Department;

4  is that correct?

5    **A.   Correct.**

6    Q.   Okay.  And is there anything else that you know

7  about those two things other than what I've already asked

8  you?

9    **A.   No, there is not.**

10    Q.   Okay.  Now, we discussed earlier the fact that a

11  sedative was sometimes given prior to the lethal injection

12  drugs; is that right?

13    **A.   We did.**

14    Q.   Okay.  Do you know why a sedative is not

15  mentioned in this July 2006 protocol?

16    **A.   I don't.  It is not a requirement.  It is for the**

17  **offender, as I understand it, if he should request it, it's**

18  **available to him.**

19    Q.   Okay.  Now, is the purpose of this sedative -- I

20  think we talked earlier, it was to reduce anxiety?

21    **A.   Yeah, it is not to carry out the execution.  It**

22  **is to assist the inmate if he wants it to reduce anxiety,**

23  **to the best of my knowledge.**

24    Q.   Okay.  To assist the inmate, correct?

25    **A.   Pardon me?**

Electronically signed by Shelly Stewart (401-194-331-8303)                                          bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   To assist the inmate; is that what you said?

2      **A.   Yes.**

3      Q.   Okay.  The answer to this may seem obvious, but

4   why does the Department not just jump to -- skip Chemical

5   No. 1 or Drug No. 1 of the three-drug sequence and just go

6   to Drug No. 2 and Drug No. 3, why use the sodium

7   thiopental?

8      **A.   This is the protocol that we adopted from other**

9   **agencies way back in the beginning when we started it.  It**

10  **seemed to be the logical way to do it.  All the physicians**

11  **that were involved seemed to be -- concurred with it, that**

12  **I remember.**

13     Q.   Okay.  So that was medical advice?

14     **A.   It was basically based on what the other**

15  **jurisdictions were using at the time and were doing so**

16  **successfully.**

17     Q.   Okay.

18     **A.   And we adopted that protocol.**

19     Q.   Now, what advantage would there be to having

20  someone receive sodium thiopental?  What is the purpose of

21  somebody being unconscious?

22          MS. BORESI:  Objection.  Asked and answered.

23          THE WITNESS:  Puts them unconscious with -- you

24  mean, what is the purpose?

25  BY MS. PILATE:

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1        Q.    Uh-huh.

2        **A.    To put them unconscious.**

3        Q.    Okay.  So you wouldn't just jump to Chemical

4   No.  2 or Chemical No. 3 while someone was awake?

5        **A.    Yeah.  I've already stated that we adopted that**

6   **protocol and it was successful.**

7        Q.    Has the Department ever tried to recruit a

8   pharmacist?

9        **A.    I don't know about the years I was gone.  I don't**

10  **recall it during the time I was here.**

11       Q.    Do you know if the Missouri Department of

12  Corrections has ever advised any other jurisdiction in how

13  to conduct executions?

14       **A.    No, we haven't advised, but there have been other**

15  **jurisdictions, I believe, that have come and observed.**

16       Q.    And who have those been?

17       **A.    The Federal Bureau of Prisons came once.**

18       Q.    Okay.  Do you know when that was?

19       **A.    Oh, gosh, no.  It was years ago.  That's the only**

20  **ones that I recall right now.**

21       Q.    Okay.

22       **A.    There may have been some during my absence.**

23       Q.    Do you know if the Missouri Department of

24  Corrections has provided any written information to -- upon

25  request to any other jurisdiction, that is, either

Electronically signed by Shelly Stewart (401-194-331-8303)                                              bed293be-8fc7-431e-b284-5910c8d127cd

1    establishing or revising an execution scheme?

2         **A.    Yes, I believe we have in the past.  You're going**

3    **to ask me what jurisdictions, and I'm not going to remember**

4    **that.**

5         Q.    Have you ever been at an execution team training?

6         **A.    I -- talking about the actual execution team?**

7         Q.    Uh-huh.

8         **A.    No.**

9         Q.    Okay.  Do you know who attends those?

10        **A.    I believe Mr. Clements does, but I'm really not**

11   **sure about that.**

12        Q.    Okay.  Who does Mr. Clements report to?

13        **A.    Me.**

14        Q.    Have you ever asked him about training?

15        **A.    No.  Well, you know, there have been successful**

16   **executions that have gone on during my absence, so I felt**

17   **like I trusted those that were subordinates, including him,**

18   **he's a very trustworthy individual to assure that things**

19   **are correct.**

20        Q.    Okay.  Have you done anything to look into or

21   oversee the execution process since you've become director?

22        **A.    I was present during the execution and I also was**

23   **there during the -- during the walkthrough in advance of**

24   **that execution process.**

25        Q.    And I'm sorry, during the Skillicorn,

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142    JEFF CITY 573-761-4350    The LAKE 573-365-5226
Case 2:09-cv-04095-BP   Document 215   Filed 01/21/11   Page 88 of 126

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1   S-k-i-l-l-i-c-o-r-n, were the lethal injection drugs

2   administered by Department employees?

3       **A.    To the best of my knowledge they were.**

4       Q.   Were you there?

5       **A.    Was I there where?  I was in the conference room**

6   **in connection with the governor's office.  I was not in the**

7   **execution chamber.**

8       Q.   Okay.  So you didn't visually observe the

9   execution as it occurred?

10      **A.    No, I did not.**

11      Q.   Do you have any knowledge of what type of

12  supervision during that execution was supplied to the

13  nonmedical members of the team by the medical personnel?

14      **A.    They were all present.**

15      Q.   Okay.  Do you know of anything else?

16      **A.    No.**

17      Q.   And you weren't personally there watching it?

18      **A.    No.**

19      Q.   What is the walkthrough that is done, what do you

20  mean by that?

21      **A.    It's actually a practice exercise.  There are**

22  **opportunities for external and internal security people to**

23  **review their role.  There are staff that play the parts of**

24  **different witnesses, et cetera, et cetera, just to make**

25  **sure that people are knowledgeable of exactly what to do,**

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    **because of the fact that the executions happen in fairly**

2    **large time spans between one another, it's important for**

3    **people to know what they are supposed to do.  That's why we**

4    **do that.**

5           Q.   Okay.  How many people participate in these

6    walkthroughs?

7           A.   **Fifty, maybe more.**

8           Q.   So it's like --

9           A.   **It's everybody that has a role.**

10          Q.   Like a big dress rehearsal?

11          A.   **It is.  Well, your words, yes.**

12          Q.   You --

13          A.   **Practice exercise.**

14          Q.   Okay.  Practice session with everybody?

15          A.   **Yes.**

16          Q.   And is this the day before?

17          A.   **No.  It's usually weeks before.**

18          Q.   Weeks before?

19          A.   **Uh-huh.**

20          Q.   When was the last time a practice session was

21   held?

22          A.   **Before the Skillicorn execution.**

23          Q.   So none recently?

24          A.   **No.**

25          Q.   Do you wait until the date is set?

Electronically signed by Shelly Stewart (401-194-331-8303)                     bed293be-8fc7-431e-b284-5910c8d127cd

1      **A.    Yes, usually.**

2      Q.    In terms of the goals to be met during an

3   execution -- I mean, obviously it's supposed to have the

4   end result of the inmate is dead, right?

5      **A.    Correct.**

6      Q.    Okay.  But it has to happen in a particular way.

7   You've got witnesses and your goals for them and there's

8   security and goals for how that is carried out.  Can you

9   describe for me in general terms, and then I'll ask some

10  more specific questions, what you expect in terms of how an

11  execution is carried out?

12     **A.    Well, I expect everybody to act as professionally**

13  **as possible with as much dignity as possible for all the**

14  **witnesses and the offender.  I mean, those are general**

15  **goals and that it happens without incident.  That's why we**

16  **do the practice exercise.**

17     Q.    Okay.  So is there a goal of -- I think you used

18  the word dignity, right?

19     **A.    I did.**

20     Q.    Okay.  So you want the proceeding to be dignified

21  for the witnesses?

22     **A.    Everybody.**

23     Q.    Okay.  When you say everybody, that includes the

24  witnesses?

25     **A.    Of course.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                        bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  And that would be the witnesses for the

2   individual being executed, right?

3      **A.   Yes.**

4      Q.   Okay.  And the witnesses who are associated with

5   the case and the crime for which the individual is being

6   executed, right?

7      **A.   You mean the State's witnesses?**

8      Q.   Yeah, State's witnesses.

9      **A.   Yes, the State's witnesses and the victim's**

10   **witnesses.**

11      Q.   Okay.  And are there also witnesses from the

12   Department of Corrections?

13      **A.   Yes, because they are -- there are people who**

14   **take care of that -- those groups of witnesses and are**

15   **present during the process.**

16      Q.   When you say dignified, what do you mean by that

17   in terms of you want the process to be dignified?

18      **A.   I mean, serious, the most professional possible,**

19   **that's what I mean by that.**

20      Q.   Okay.  You don't want anything to go wrong during

21   the process?

22      **A.   Of course not.**

23      Q.   Have you heard of elsewhere, botched executions?

24      **A.   Yes, I have heard the term.**

25      Q.   Okay.  And what does that term mean to you?

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1      A.   That there's a difficulty with the execution

2   process itself.

3      Q.   Okay.  Things don't go right?

4      A.   Your words, yeah.

5      Q.   Well, I'm asking you.

6      A.   Yeah, something happened.

7      Q.   Something doesn't go right?

8      A.   Something of magnitude has gone the way it

9   shouldn't or whatever.

10      Q.   Okay.  And does that mean in some cases that the

11   inmate would not be executed within the expected time

12   frame?

13      A.   It could.

14      Q.   Okay.  And sometimes complications would be

15   encountered in the execution process?

16      A.   It could happen.

17      Q.   Okay.  And are you trying to avoid those?

18      A.   Oh, of course.

19      Q.   Okay.  And what is the purpose of avoiding those?

20      A.   The purpose of avoiding --

21      Q.   Uh-huh.  Wanting things to go smoothly, yeah.

22      A.   You want it to go as smoothly as possible without

23   an issue.

24      Q.   Okay.  And is the purpose of avoiding an issue so

25   that, or is one of the reasons so that the people who are

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1    watching the execution are not subjected to unnecessary

2    trauma?

3         **A.    Oh, sure.   Sure.**

4         Q.   So you want to keep the execution for those

5    individuals dignified and not filled with any unnecessary

6    trauma?

7         **A.    Certainly.**

8         Q.   Okay.   Now, with regard to the individual being

9    executed, would those same goals still apply?

10        **A.    Yes.**

11        Q.   Okay.   Dignified, right?

12        **A.    Yes.**

13        Q.   And no unnecessary trauma?

14        **A.    Yes.**

15        Q.   Okay.   And to the extent possible, no infliction

16   of physical pain?

17        **A.    Whatever happens with the drugs, I really don't**

18   **know, but other than that, yes.**

19        Q.   Okay.   Is it your understanding with regard to

20   the drugs that they are set up the way that they are to

21   reduce or eliminate the possibility of physical pain?

22        **A.    I think that's the case.**

23        Q.   Okay.   Prior to the lethal injection drugs

24   actually being injected into the individual, would it be

25   fair to say that the inmate is being treated as somebody

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    might otherwise be treated in any other medical procedure

2    who is offered a sedative, given a blanket and a pillow,

3    offered reassurance --

4         A.   All that's true.

5         Q.   -- these kinds of things?

6         A.   Yes.

7         Q.   So those would be familiar kinds of a process

8    that would occur on perhaps anytime someone who is getting

9    an IV and medication and such?

10        A.   Yes, I suppose.

11        Q.   Okay.  But the end result, obviously, is

12   different; is that right?

13        A.   Certainly.

14             MS. PILATE:  This would be a good place to take a

15   break.

16             (A LUNCH BREAK WAS TAKEN.)

17             (PETITIONERS' DEPOSITION EXHIBIT NOS. 3 AND 4

18   WERE MARKED FOR IDENTIFICATION BY THE COURT REPORTER.)

19   BY MS. PILATE:

20        Q.   I'm going to hand you what I have marked as

21   Exhibit 3 and ask you if you could look at that document,

22   please.  Do you recognize that document?

23        A.   I do.

24        Q.   Have you seen it before?

25        A.   I have.

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   And when have you seen that?

2      **A.   Apparently on 5-27-09.**

3      Q.   Is that your signature?

4      **A.   It is.**

5      Q.   Okay.  On the first page of that exhibit, what is

6  that, please, if you could tell me what that is?

7      **A.   This, the cover page?**

8      Q.   Yeah.  What is that?

9      **A.   It's a memo from Tom Clements, director of**

10  **Institutions, to Warden Steve Larkins of ERDCC explaining**

11  **that the sequence of chemical log forms have been approved**

12  **by both he and I.**

13      Q.   Okay.  Do you recall doing that approval?

14      **A.   Yeah, vaguely.**

15      Q.   Okay.  If you turn the page, is that the sequence

16  of chemicals?

17      **A.   To the best of my knowledge, yes.**

18      Q.   Do you see the Nos. 1, 2, 3, 4 and 5?

19      **A.   I do.**

20      Q.   Do you know why in this checkoff box, the box

21  where it's numbered one, two, three, four, five --

22      **A.   Uh-huh.**

23      Q.   -- that no one noted the times that various

24  syringes were administered?

25      **A.   No, I don't.**

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Do you know why that's not required?

2    **A.   No.**

3    Q.   Looking towards the bottom, do you see NM1 and

4    NM2?

5    **A.   Yes.**

6    Q.   Are those the departmental employees assigned to

7    the execution team?

8    **A.   Yes, to my knowledge.**

9    Q.   And NM stands for nonmedical?

10   **A.   Yes.**

11   Q.   And M3, is that the doctor?

12   **A.   I believe one of them is, either M3 or M2.**

13   Q.   Okay.  And the other is the nurse?

14   **A.   To the best of my knowledge.**

15   Q.   Okay.  And turning the page, can you tell me what

16   that is?

17   **A.   These are the -- information about the different**

18   **drugs that were administered.**

19   Q.   Okay.

20   **A.   About the amount used.**

21   Q.   Okay.  What is the purpose of this page?

22   **A.   To indicate that these were the drugs that were**

23   **used for the execution.**

24   Q.   Okay.  Is that your signature on this page?

25   **A.   It is.**

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Okay.  You can move that into that stack.

2    **A.   Okay.**

3    Q.   I'm going to hand you what I've marked as

4    Exhibit 4.

5    **A.   Uh-huh.**

6    Q.   And is Exhibit 4 the same form absent being

7    filled out?

8    **A.   I'm sorry?**

9    Q.   Filled out.  It's not filled out, it's blank,

10   right?

11   **A.   Yes.**

12   Q.   Okay.  If you could turn to the next page,

13   please, do you see a pre-execution summary of medical

14   history?

15   **A.   I do.**

16   Q.   Okay.  Have you ever seen this form before?

17   **A.   I don't remember seeing this.**

18   Q.   You don't?

19   **A.   No.**

20   Q.   Do you know what it is?

21   **A.   It speaks for itself, pre-execution summary of**

22   **medical history.**

23   Q.   Do you know what the purpose is in taking a

24   medical history?

25   **A.   I assume to help -- I don't know for sure, but I**

Electronically signed by Shelly Stewart (401-194-331-8303)

bed293be-8fc7-431e-b284-5910c8d127cd

1  **think it has something to do with the physician making a**

2  **decision about whether the history should play a part in**

3  **drugs, but I don't know that for sure.**

4  Q.  Has there -- do you know if there's been any

5  attention to whether drug interactions could occur with any

6  of the medications that an inmate is currently taking prior

7  to the execution?

8  **A.  I don't know that.**

9  Q.  Do you know if there has been any attention to

10  medical conditions that an inmate might have that would

11  interfere with the effort to execute him?

12  **A.  No, I don't know that.**

13  Q.  At any time when you have been employed with the

14  Department of Corrections, not just recently, but going

15  back to your 33-year period, has there been any point at

16  which there has been any discussion of whether to switch to

17  another method of execution other than lethal injection

18  with these three drugs?

19  **A.  There has not.**

20  Q.  Okay.  Has anyone discussed this medical form

21  with you?

22  **A.  Not that I recall.**

23  Q.  Okay.  Do you have any understanding of what its

24  purpose is?

25  **A.  No, other than what I've just described as a**

Electronically signed by Shelly Stewart (401-194-331-8303)

1    **possibility, but beyond that, I don't know.**

2         Q.   Did you know whether there was any effort to

3    screen an inmate for any medical problems that might affect

4    the execution or his -- or the inmate's level of comfort or

5    discomfort during the execution?

6         **A.   No, I don't know.**

7         Q.   So you basically knew nothing about this?

8         **A.   Right.**

9         Q.   Okay.  Now, turning to the next page, can you

10   tell me what this is?

11        **A.   It appears to be a checklist of the use of the**

12   **drugs during the execution process.**

13        Q.   Okay.  Do you know why lines are drawn through

14   this form?

15        **A.   I do not.**

16             MS. BORESI:  I can tell you, I'm the one that did

17   it.

18             MS. PILATE:  Okay.  Go ahead.

19             MS. BORESI:  So the form couldn't be used in

20   blank to create a fabricated document.

21             MS. PILATE:  Well, who would do that?

22             MS. BORESI:  Documents get circulated in the

23   public.

24             MS. PILATE:  Well, so that -- there's a

25   protective order in place and I really think that the

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1   lawyers involved in it would never do anything like that.

2           MS. BORESI:  Oh, I understand.

3           MS. PILATE:  There are also other blank forms, so

4   I don't think there is any danger.

5   BY MS. PILATE:

6       Q.  Do you see the box that says check when

7   completed?

8       **A.  Yes.**

9       Q.  Okay.  Is someone supposed to indicate on this

10  form the time in which these various syringes were given?

11      **A.  I'm not familiar with this form, so I really**

12  **can't answer that question.**

13      Q.  Okay.  So you don't know?

14      **A.  No.**

15          MS. PILATE:  I need another sticker.

16          (PETITIONERS' DEPOSITION EXHIBIT NO. 5 WAS MARKED

17  FOR IDENTIFICATION BY THE COURT REPORTER.)

18  BY MS. PILATE:

19      Q.  I'm handing you what I've marked as Deposition

20  Exhibit 5 and if you could, please take a look at that.

21  Have you ever seen this document before?

22      **A.  I have not.**

23      Q.  You have not?

24      **A.  No, I have not.**

25      Q.  Okay.  Do you know what it is?

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350   The LAKE 573-365-5226

Electronically signed by Shelly Stewart (401-194-331-8303)   bed293be-8fc7-431e-b284-5910c8d127cd

1      **A.    No.**

2      Q.    Do you want to flip through it and take a minute

3    and look at it and tell me if it means anything to you or

4    do you think you've seen it at any point?

5      **A.    I've never seen this before, to my knowledge.**

6      Q.    Okay.  Do you have any knowledge as to anything

7    that's in the form?

8      **A.    It speaks for itself.  Again, it looks like it's**

9    **registrations from the -- control registration from the**

10    **Department of Justice, Drug Enforcement Agency.**

11      Q.    Who's responsible for obtaining these licenses?

12      **A.    I'm not really sure about that, whether**

13    **Mr. Clements is or the facility itself is through**

14    **Mr. Clements.  I'm not sure.**

15      Q.    Do you believe that Mr. Clements would be in the

16    chain of responsibility as to this document?

17      **A.    Could be.**

18      Q.    Okay.

19           MS. PILATE:  Another sticker.

20           (PETITIONERS' DEPOSITION EXHIBIT NO. 6 WAS MARKED

21    FOR IDENTIFICATION BY THE COURT REPORTER.)

22    BY MS. PILATE:

23      Q.    Okay.  I'm going to hand you Deposition Exhibit 6

24    and ask if you could take a look at that.

25           MS. PILATE:  You know, I handed this out earlier

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1   and I don't think I'm going to use this whole thing in this
2   deposition, so you can give that back to me.  It's just a
3   bunch of drug logs.
4   BY MS. PILATE:
5        Q.   Have you seen this document before?
6        **A.   No.**
7        Q.   Okay.  Do you know what this is?
8        **A.   It says it is a lethal injection protocol for**
9   **execution team members.**
10       Q.   Okay.  So you've never seen this before?
11       **A.   I have not.**
12       Q.   And no one has asked you to review this?
13       **A.   No, this was developed apparently during the time**
14   **I was gone.**
15       Q.   Do you know who drafted this?
16       **A.   I do not.**
17       Q.   Do you know if anything in this lesson plan has
18   changed since it was written?
19       **A.   I do not know that.**
20       Q.   Do you know how often team members are trained
21   with this curriculum?
22       **A.   I don't.**
23       Q.   Has anyone ever asked you to review this?
24       **A.   They have not.**
25       Q.   Do you know where this curriculum is maintained?

Electronically signed by Shelly Stewart (401-194-331-8303)                bed293be-8fc7-431e-b284-5910c8d127cd

1      **A.   I do not.**

2      Q.   There was one page in here I wanted to ask you

3 about.  Okay.  If you can find Page 384, it's toward the

4 back.

5      **A.   Page 384?**

6      Q.   Uh-huh.

7      **A.   Okay.**

8      Q.   Okay.  Have you ever seen this particular

9 document before?

10     **A.   I can't recall if I have or not.**

11     Q.   Do you see where it says at the top simulation

12 training?  Were you ever given anything like this when you

13 went through the simulation with Mr. Skillicorn?

14     **A.   No.**

15     Q.   Could you read the sequence of events and tell me

16 if it comports with your understanding?

17     **A.   Yes.**

18     Q.   Okay.

19     **A.   I believe that this is generally what is to occur**

20 **during a process.  I think this is an up-to-date process,**

21 **especially the pieces that are mine in particular.**

22     Q.   Okay.  When the simulation was done with regard

23 to Dennis Skillicorn, was there a simulated review of his

24 pre-execution summary of medical history?

25     **A.   I don't know that.**

Electronically signed by Shelly Stewart (401-194-331-8303)           bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Was there an offering of a sedative four to five

2  hours before the scheduled execution?

3    **A.   I don't know that.**

4    Q.   Okay.

5    **A.   It would be simulated if there was, of course.**

6    Q.   Well, that's what I mean.  Was that simulated?

7    **A.   Yeah, I don't know that in specific.  I was not**

8  **in that part of the operation.**

9    Q.   Okay.  Was there a simulation of the securing of

10  the gurney?

11    **A.   I believe there was, but I don't recall it in**

12  **particular.**

13    Q.   Was there a simulation of people, medical and

14  nonmedical personnel, reporting to their post in the

15  execution room?

16    **A.   To the best of my knowledge, yes.**

17    Q.   Was there a simulation of the preparation of

18  lethal injection drugs?

19    **A.   To the best of my knowledge, yes.**

20    Q.   What do you mean to the best of your knowledge?

21    **A.   I didn't have direct observation of any of that.**

22    Q.   Okay.  So during the simulation, even you did not

23  see any of this?

24    **A.   No.**

25    Q.   And why was that?

Electronically signed by Shelly Stewart (401-194-331-8303)                                        bed293be-8fc7-431e-b284-5910c8d127cd

1     **A.    Because my job was to be in the conference room**

2  **and playing my role as the Department director, so I**

3  **simulated the contact with the governor's office.**

4     Q.    Okay.  So you have never seen any of this?

5     **A.    Not in particular.**

6     Q.    Okay.  Neither simulated nor live?

7     **A.    No.**

8     Q.    Okay.  I should say simulated or real, I guess.

9          Did anyone tell you whether the syringes were

10  prepared during the simulation?

11     **A.    I don't recall.**

12     Q.    Do you see at 10:30 it states that the warden

13  reports to the execution room and brings a chronological

14  log of execution room operations?

15     **A.    I see that.**

16     Q.    Okay.  Do you know where that log is maintained?

17     **A.    No.**

18     Q.    Have you ever seen such a log?

19     **A.    I can't recall if I have or haven't.**

20     Q.    Okay.  Did you see any such log after the

21  execution of Mr. Skillicorn?

22     **A.    I don't recall if I did or not.  Well, you just**

23  **showed me whatever that exhibit was that I signed off on, I**

24  **did see that obviously.**

25     Q.    Well, that pertained to the drugs, right?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1          **A.    Right.**

2          Q.   But not execution room operations?

3          **A.    No.**

4          Q.   Okay.

5          **A.    And I don't recall seeing that.**

6          Q.   At eleven o'clock it says, medical personnel,

7     nonmedical personnel are at their assigned post in the

8     execution room, which is verified by the operations

9     officer.   Who is the operations officer?

10         **A.    I don't give that information.**

11         Q.   I'm not asking for his or her name.   You can

12    describe that person.

13         **A.    It's an individual that works for the Department.**

14         Q.   Okay.   So is that person an NM1 or NM2?

15         **A.    No.**

16         Q.   It's another person?

17         **A.    Correct.**

18         Q.   Okay.   Is that person present in the execution

19    chamber during the execution?

20         **A.    I don't know that.**

21         Q.   What is that person's responsibilities?

22         **A.    To make sure that people are on their posts in**

23    **the execution room.**

24         Q.   Does that person have any other responsibilities?

25         **A.    I don't recall that they do.   I don't know.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                        bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.    Is there anyone who is designated to supervise

2    the execution team as a whole?

3      **A.    Other than, you know, Mr. Clements overseeing the**

4    **process himself.  He's not present in the execution chamber**

5    **however.**

6      Q.    Okay.  Where is Mr. Clements during the

7    execution?

8      **A.    He plays the role that I played when I was**

9    **director of institutions.  He's with the witnesses.**

10     Q.    Okay.  So he's not in the execution room or the

11   chamber itself?

12     **A.    No.**

13     Q.    Okay.  Who is there?  Who is in the execution

14   room?

15     **A.    M1 and M2 inform NM1 and NM2 or whatever that is,**

16   **NM1 and NM2.**

17     Q.    That's all, nobody else?

18     **A.    To the best of my knowledge, that's all.**

19     Q.    11:15, do you see where it says escort to

20   execution room, director of Department of Corrections slash

21   designee advise ERDCC warden that offender may be escorted

22   to the execution room if no stay is in place and no legal

23   activity is in progress to prevent the execution.  Is that

24   person you?

25     **A.    Yes.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Okay.  And what did you do during the simulation?

2    **A.   I said those words.**

3    Q.   Okay.  Do you see where it says DAI director, is

4    that Director of Adult Institutions?

5    **A.   It is.**

6    Q.   Slash designee will direct ERDCC warden to read

7    the warrant statement to offender once he is secured to the

8    gurney.  Do you see that?

9    **A.   Yes.**

10   Q.   Does this suggest to you that prior to this point

11   the individual is not secured to the gurney?

12   **A.   He's secured to the gurney before the warrant is**

13   **read.**

14   Q.   Okay.  Is he secured to the gurney prior to being

15   placed in the execution chamber?

16   **A.   No.**

17   Q.   Okay.  So he walks into the execution chamber?

18   **A.   He does.**

19   Q.   Do you see where it says assigned staff shall

20   escort offender from the holding cell to the gurney and

21   secure restraints?

22   **A.   Correct.**

23   Q.   Okay.  Who walks the inmate into the execution

24   chamber?

25   **A.   The assigned staff.**

Electronically signed by Shelly Stewart (401-194-331-8303)

1      Q.   Okay.  And who are they?  Are they part of the

2   execution team?

3      **A.   They are members of the staff.**

4      Q.   Okay.  But not otherwise members of the execution

5   team?

6      **A.   Of the four people in the execution team?**

7      Q.   Uh-huh.

8      **A.   No, they are not.**

9      Q.   Okay.  Do you see where it says 11:20 p.m. and

10   the IVs are being inserted?

11      **A.   Yes.**

12      Q.   Okay.  So before this point there are no IVs; is

13   that correct?

14      **A.   Yes.  Of course, he has to be on the gurney**

15   **before they are secured, which happened at 11:15.**

16      Q.   Okay.  The next paragraph, do you see references

17   to Valium, Versed, ketamine and Haldol?

18      **A.   Yes.**

19      Q.   Okay.  Do you know what all of those drugs are?

20      **A.   No.**

21      Q.   Do you know what Valium is?

22      **A.   Yeah, I've got an idea what it is.**

23      Q.   Okay.  What is it?

24      **A.   It's a sedative of sorts.**

25      Q.   Okay.  What is Versed?

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1      **A.    The same and as far as I know.**

2      Q.    Ketamine?

3      **A.    Don't know anything about it.**

4      Q.    Haldol?

5      **A.    Don't know anything about it.**

6      Q.    And then next at 11:40 it says, ERDCC warden or

7    nonmedical personnel shall contact the director of the

8    Department of Corrections slash designee and advise if

9    there are any delays in the preparation process.  Do you

10   see that?

11     **A.    I do.**

12     Q.    Were there any delays in your simulation?

13     **A.    No, not to my knowledge.**

14     Q.    Okay.  And at midnight, it says the director of

15   the Department of Corrections slash designee shall advise

16   ERDCC warden to proceed with or stop the chemical injection

17   process.

18           MS. PILATE:  And I should note here for the court

19   reporter when I say ERDCC, those are all caps.

20           THE COURT REPORTER:  Yes.

21           MS. PILATE:  That's the acronym of the

22   institution.

23           THE COURT REPORTER:  Right.

24   BY MS. PILATE:

25     Q.    If the execution is to proceed, he will give the

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    directive, you are hereby directed to proceed with the

2    lawful execution of offender.  Proceed as prescribed in the

3    Department of Corrections protocol for execution of

4    offender.  Is that a statement that you read?

5         **A.   Yes.**

6         Q.   And does anyone else state those same

7    instructions?

8         **A.   I'm sorry?**

9         Q.   Does anyone else state those same instructions or

10   are you the only one that does that?

11        **A.   I'm the only one that says that.  Well, it is**

12   **repeated by the warden.**

13        Q.   Okay.  Now, at the bottom of the page, you see

14   where it says medical personnel monitor the

15   electrocardiograph?

16        **A.   Yes, I do.**

17        Q.   And the offender during the execution?

18        **A.   Yes.**

19        Q.   Okay.  And their job is to continue to try and

20   ensure the inmate's freedom from pain and to attend to

21   whatever comfort can be provided; is that their job there?

22        **A.   At that point, as I understand it, they are**

23   **observing through the window and then observing the EKG at**

24   **the same time.**

25        Q.   Okay.  So they are not actually in the chamber

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    with him?

2         **A.   They are not.**

3         Q.   Is he by himself at that point?

4         **A.   He is.**

5         Q.   Okay.  Then it states, nonmedical personnel

6    remove the chemicals from the tray and begin the chemical

7    injection process.  Is that correct that the nonmedical

8    individuals pick up these syringes?

9         **A.   To the best of my knowledge.**

10        Q.   Okay.  Do you see where it states, if a problem

11   occurs, should the flow of chemicals become impeded or the

12   IV is leaking, the application of chemicals should be

13   stopped and medical personnel should address this issue?

14   Do you see that?

15        **A.   Yes.**

16        Q.   Okay.  Have you ever simulated a problem during

17   an execution?

18        **A.   I don't recall that we have, but I don't know.  I**

19   **mean, obviously I was wasn't present for a number of**

20   **executions.**

21        Q.   Okay.  So -- but in your simulation or any

22   meetings or trainings that you've been involved with or are

23   aware of, are you -- do you know whether there has been any

24   simulation to prepare for a problem?

25        **A.   I don't.**

Electronically signed by Shelly Stewart (401-194-331-8303)                                     bed293be-8fc7-431e-b284-5910c8d127cd

1      Q.   Okay.  During the time the execution is

2   occurring, is the only time the execution chamber is

3   entered by anyone is when medical personnel enter the

4   chamber to see whether the inmate is conscious or not?

5      **A.   Correct.**

6      Q.   During a simulation or training, has anyone ever

7   simulated a situation where the four syringes containing

8   the initial drug did not bring about unconsciousness and

9   someone needed to resort to the use of the second set of

10  syringes?  Has that scenario ever been simulated?

11     **A.   I don't know that.**

12     Q.   Okay.  Do you see towards the bottom of the page

13  under the paragraph following, this completes Phase III?

14  Do you see where it says, should activity of the offender's

15  heart fail to cease after five minutes, medical personnel

16  prepare an additional syringe of potassium chloride and

17  give it to nonmedical personnel, the nonmedical personnel

18  inject the additional syringe of potassium chloride?

19          Can you tell me if there's ever been a simulation

20  or training in which the first syringe of potassium

21  chloride failed to achieve the goal and the scenario

22  involved the simulation of giving a second syringe of

23  potassium chloride?

24     **A.   I don't know that.**

25     Q.   Do you know if there's even been a simulation or

Electronically signed by Shelly Stewart (401-194-331-8303)                      bed293be-8fc7-431e-b284-5910c8d127cd

1   training of any kind that addressed a situation where there
2   was a completely unanticipated problem, such as where an IV
3   didn't work or the drugs, for whatever reason, did not
4   enter the circulatory system of the inmate?
5       A.   I don't recall that.
6       Q.   Have you heard about the situation in Ohio where
7   attempts were made for two hours to start an IV line on an
8   offender and everything failed?
9       A.   No.
10      Q.   Okay.  You haven't heard of that?
11      A.   No.
12      Q.   Is there a backup plan for a situation where
13  someone just can't get an IV started, or for whatever
14  reason, the drugs do not circulate properly?
15      A.   No, I'm not aware of that.  There are methods by
16  which injections can occur.
17      Q.   I'm sorry?
18      A.   There are methods by which injections can occur
19  through other procedures.  No, I'm not.
20      Q.   Okay.  Well, what I'm asking you is, are you
21  aware of any backup plan?
22      A.   No, I'm not.
23      Q.   Okay.  Continuing to flip through this exhibit,
24  if you could look at Pages 391 through 394?
25      A.   Okay.

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    Q.   Are those training records?

2    **A.   They appear to be, but I really don't know.**

3    Q.   Okay.  Well -- okay.  Do you see in the upper

4  right-hand corner where it states, Medical Team Member M2,

5  Medical Team Member M3 and then Nonmedical 1 and

6  Nonmedical 2?  Do you see that?

7    **A.   Yes.**

8    Q.   Okay.  Excluding the execution of Dennis

9  Skillicorn, in reviewing Page 394 which applies to

10  Nonmedical Team Member 2, would you agree that there appear

11  to be 11 training sessions listed?

12    **A.   Yes.  Yes.**

13    Q.   Okay.  And in reviewing the form for

14  Nonmedical 1, would you agree that there appear to be 11

15  training sessions?

16    **A.   Yes.**

17    Q.   Okay.  Then looking at Page 391, would you agree

18  there appear to be 11 training sessions for Medical 2, M2?

19    **A.   Yes.**

20    Q.   Okay.  And then looking at the Page 392 for M3,

21  would you agree that there appear to be fewer training

22  sessions for M3?

23    **A.   Yes.**

24    Q.   Okay.  And would you agree that there are eight

25  training sessions listed for M3 as compared with eleven

Electronically signed by Shelly Stewart (401-194-331-8303)                                    bed293be-8fc7-431e-b284-5910c8d127cd

1    training sessions for the other team participants or team

2    members?

3         **A.    Yes, that appears that's so.**

4         Q.    Has anyone ever told you how a simulation or

5    training is conducted when M3 is not present?

6         **A.    No.**

7         Q.    Has anyone ever told you whether the roles are

8    assigned any differently when there is one medical

9    personnel present instead of two?

10        **A.    No.**

11        Q.    At this point is there a contract with the

12   medical team members to continue their participation in

13   executions into the future?

14        **A.    I believe that's true.**

15        Q.    Do you know for how long that time period is?

16        **A.    No.**

17        Q.    Has anyone ever discussed with you a need to have

18   a training or simulation that addresses a situation in

19   which unanticipated problems arise?

20        **A.    No.**

21        Q.    Has anyone ever discussed with you whether an

22   individual inmate's condition would make it difficult to

23   accomplish the execution or would make it difficult to

24   accomplish without inflicting pain of constitutional

25   magnitude?

Electronically signed by Shelly Stewart (401-194-331-8303)    bed293be-8fc7-431e-b284-5910c8d127cd

1       **A.    No.**

2       Q.    Okay.  Are you aware of an inmate by the name of

3   Russell Bucklew?

4       **A.    No.**

5       Q.    Okay.  So you've never heard of him?

6       **A.    No.**

7       Q.    Has anyone told you that there is an inmate who

8   has a condition called cavernous hemangioma?

9       **A.    No.**

10      Q.    Do you know what cavernous hemangioma is?

11      **A.    I do not.**

12      Q.    Well, I'll tell you, it's basically

13   conglomerations of malformed vessels in body cavities that

14   kind of look a little bit like tumors.  Has anyone ever

15   discussed with you whether an inmate had a condition like

16   that or whether it would complicate efforts to achieve an

17   execution?

18      **A.    No.**

19      Q.    Are you aware of any practical problems that

20   could occur in an effort to conduct an execution?

21      **A.    No.**

22      Q.    Are you aware of any medical problems that could

23   occur in an effort to conduct an execution?

24      **A.    No.**

25      Q.    Are there any plans in the future to have

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1    prescriptions for any of the medications or drugs used in

2    an execution?

3         **A.    No.**

4         Q.    Has there ever been any committee or working

5    group within the Department of Corrections to address

6    whether there are any problems, legal or otherwise, that

7    might arise with the use of the drugs that are used in

8    lethal injection?

9         **A.    No.**

10         Q.    Has anyone ever addressed with you whether any

11    additional licensure or certificates or certifications of

12    any kind are necessary to dispense or administer any of the

13    drugs used in lethal injection?

14         **A.    No.**

15              MS. PILATE:  I want to talk with my co-counsel

16    for a minute, and I think we may be ready to wrap it up.

17              (A BREAK WAS TAKEN.)

18              MS. PILATE:  I am pleased to report we are done.

19              (SIGNATURE REQUESTED.)

20

21

22

23

24

25

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1  August 26, 2010

2

3

4  Susan D. Boresi
5  Attorney at Law
6  815 Olive Street
7  Suite 200
8  St. Louis, Missouri  63101

9

   In Re:  EARL RINGO, et al. vs. GEORGE A. LOMBARDI, et al.
10

   Dear Ms. Boresi:
11

   Please find enclosed your copy of the deposition of
12  George A. Lombardi taken on August 23, 2010, in the
   above-referenced case.  Also enclosed is the original
13  signature page and errata sheet.

14  Please have Mr. Lombardi read your copy of the transcript,
   indicate any changes and/or corrections desired on the
15  errata sheet and sign the signature page in front of a
   notary public.

16

   Please return the errata sheet and signed signature page to
17  Ms. Pilate so she can file the original deposition in the
   appropriate manner.

18

   If you have any questions, please feel free to call me.

19

   Sincerely,

20

21  Shelly L. Stewart
   Shelly L. Stewart, CCR

22  CAPITAL CITY COURT REPORTING

23  Enclosures

24

25  cc:  Cheryl A. Pilate

CAPITAL CITY COURT REPORTING
COLUMBIA 573-445-4142   JEFF CITY 573-761-4350   The LAKE 573-365-5226

Electronically signed by Shelly Stewart (401-194-331-8303)                                     bed293be-8fc7-431e-b284-5910c8d127cd

```
1    (THIS IS THE SIGNATURE PAGE TO THE DEPOSITION OF GEORGE A.

2    LOMBARDI TAKEN ON AUGUST 23, 2010.)

3

4

5

6

7

8              _____

9                     GEORGE A. LOMBARDI

10

11   Subscribed and sworn before me on this _____ day

12   of _____ 2010.

13   My Commission expires _____.

14

15

16

17              NOTARY PUBLIC - STATE OF MISSOURI

                Commissioned in          County

18

19

20

21

22

23

24

25
```

Electronically signed by Shelly Stewart (401-194-331-8303)                                bed293be-8fc7-431e-b284-5910c8d127cd

```
 1              E R R A T A   S H E E T

 2                    Page 1 of 2

 3

 4     Deponent:  GEORGE A. LOMBARDI

 5     In Re:  EARL RINGO, et al. vs. GEORGE A. LOMBARDI, et al.

 6

 7     Date Taken:  AUGUST 23, 2010

 8

 9     Page #_____,  Line #_____,

10     Should Read:  _____

11     Reason for Change:  _____

12     Page #_____,  Line #_____,

13     Should Read:  _____

14     Reason for Change:  _____

15     Page #_____,  Line #_____,

16     Should Read:  _____

17     Reason for Change:  _____

18     Page #_____,  Line #_____,

19     Should Read:  _____

20     Reason for Change:  _____

       Page #_____,  Line #_____,

21     Should Read:  _____

22     Reason for Change:  _____

       Page #_____,  Line #_____,

23     Should Read:  _____

24     Reason for Change:  _____

25
```

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

```
 1              E R R A T A   S H E E T

 2                    Page 2 of 2

 3

 4     Page #_____,  Line #_____,

 5     Should Read:  _____

 6     Reason for Change:  _____

 7     Page #_____,  Line #_____,

 8     Should Read:  _____

 9     Reason for Change:  _____

10     Page #_____,  Line #_____,

11     Should Read:  _____

12     Reason for Change:  _____

13     Page #_____,  Line #_____,

14     Should Read:  _____

15     Reason for Change:  _____

16     Page #_____,  Line #_____,

17     Should Read:  _____

18     Reason for Change:  _____

19     Page #_____,  Line #_____,

20     Should Read:  _____

21     Reason for Change:  _____

22     Page #_____,  Line #_____,

23     Should Read:  _____

24     Reason for Change:  _____

25
```

Electronically signed by Shelly Stewart (401-194-331-8303)          bed293be-8fc7-431e-b284-5910c8d127cd

```
 1                C E R T I F I C A T E
 2
 3    I, Shelly L. Stewart, Certified Court Reporter, Capital
 4    City Court Reporting, 210 East High Street, Suite 110,
 5    Jefferson City, Missouri 65101, do hereby certify that
 6    pursuant to notice, there came before me,
 7
 8                  GEORGE A. LOMBARDI,
 9
      at the offices of the Missouri Attorney General, Broadway
10    State Office Building, 221 West High Street, 6th Floor, in
      the City of Jefferson, County of Cole, State of Missouri,
11    on August 23, 2010, who was first duly sworn to testify to
      the whole truth of his knowledge concerning the matter in
12    controversy aforesaid; that he was examined and his
      examination was then and there written in machine shorthand
13    by me and afterwards typed under my supervision, and is
      fully and correctly set forth in the foregoing pages; and
14    the witness and counsel waived presentment of this
      deposition to the witness, by me, and that the signature
15    shall be acknowledged by a notary public, and the
      deposition is now herewith returned.
16
      I further certify that I am neither attorney or counsel
17    for, nor related to, nor employed by any of the parties to
      this action which this deposition is taken; and
18    furthermore, that I am not a relative or employee of any
      attorney or counsel employed by the parties hereto, or
19    financially interested in this action.
      IN WITNESS WHEREOF, I have hereunto set my hand on this
20    26th day of August 2010.
21

22
23                           _____
24                           SHELLY L. STEWART, CCR
25                           CAPITAL CITY COURT REPORTING
```

Electronically signed by Shelly Stewart (401-194-331-8303)                bed293be-8fc7-431e-b284-5910c8d127cd

```
 1                         COURT MEMO
 2           IN THE UNITED STATES DISTRICT COURT
 3           FOR THE WESTERN DISTRICT OF MISSOURI
 4                     CENTRAL DIVISION
 5
 6     EARL RINGO, et al.,        )
 7                                )
 8         Petitioners,           )
 9                                )
               vs.                )   Case No. 09-04095-NKL
10                                )
       GEORGE A. LOMBARDI, et     )
11     al.,                       )
                                  )
12         Respondents.           )

13        CERTIFICATE OF OFFICER & STATEMENT OF COSTS
          Transcript of Deposition of GEORGE A. LOMBARDI
14                      August 23, 2010

15     Name & address of person or firm having custody of the
       original transcript:  CHERYL A. PILATE, 142 North Cherry
16     Street, Olathe, Kansas  66061:

17
       TAXED IN FAVOR OF:  Petitioners Ringo, Middleton, Bucklew
18     and Smulls, represented by CHERYL A. PILATE:  Attendance,
       original, e-transcript & shipping & handling,
19
                     TOTAL.......$679.00
20

21     TAXED IN FAVOR OF:  Petitioners Ringo, Middleton, Bucklew
       and Smulls, represented by JOSEPH W. LUBY:  No copy,
22
23                   TOTAL.......$-0-
24
25
```

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd

1          C O U R T   M E M O   C O N T I N U E D

2

3    TAXED IN FAVOR OF:  Defendants, represented by SUSAN D.

4    BORESI:  E-transcript,

5

6                   TOTAL.......$252.00

7

8

9    TAXED IN FAVOR OF:  Defendants, represented by MICHAEL J.

10   SPILLANE:  No copy,

11

12                  TOTAL.......$-0-

13

14

15

     Upon delivery of transcript, the above charges had not yet

16   been paid.  It is anticipated that all charges will be paid

     in the normal course of business.

17

                   SHELLY L. STEWART, CCR (No. 619)

18                  CAPITAL CITY COURT REPORTING

              Jefferson City ** The Lake ** Columbia

19         573-761-4350 * 573-365-5226 * 573-445-4142

20   IN AFFIRMATION THEREOF, I have hereunto set my hand on this

     26th day of August 2010.

21

22         _____

23                  SHELLY STEWART, CCR

24                  CAPITAL CITY COURT REPORTING

25

Electronically signed by Shelly Stewart (401-194-331-8303)                    bed293be-8fc7-431e-b284-5910c8d127cd